Richey Wayne PEAVLER, Appellant (Plaintiff Below),

v.

BOARD OF COMMISSIONERS OF MONROE COUNTY, Appellee (Defendant Below).

BOARD OF COMMISSIONERS OF the COUNTY OF STEUBEN, Appellant (Defendant Below),

v.

Ronald HOUT and Pamela Hout, Appellees (Plaintiffs Below).

Nos. 36S01–8809–CV–817, 43S03–8809–CV–818.

Supreme Court of Indiana.

Sept. 9, 1988.

James R. Fisher, Robert B. Clemens, Ice Miller Donadio & Ryan, Indianapolis, for Richey Wayne Peavler.

William E. Borror, Hunt Suedhoff Borror & Eilbacher, Ft. Wayne, for Board of Comrs. of County of Steuben.

Michael C. Cook, Dale W. Eikenberry, Wooden McLaughlin & Sterner, Indianapolis, Thomas J. Lantz, Montgomery Elsner & Pardieck, Seymour, for Board of Com'rs of Monroe County.

Sherrill Wm. Colvin, John O. Feighner, Snouffer, Haler & Colvin, Ft. Wayne, for Ronald Hout and Pamela Hout.

SHEPARD, Chief Justice.

Two cases before us on petitions for transfer require that we construe the provision in the Indiana Tort Claims Act which provides governmental immunity for discretionary acts.

Richey Wayne Peavler filed suit against the Monroe County Board of Commissioners, alleging "negligence in the failure to place or maintain a curve warning sign, and/or reduced speed limit sign or advisory speed limit sign on a portion of a county road." *Peavler v. Board of Commissioners of Monroe County* (1986), Ind.App., 492 N.E.2d 1086, 1087. The jury returned a verdict for the county. The Court of Appeals found that the trial court erred in instructing the jury that any duty on the part of the county to post warning signs was discretionary. The Court of Appeals concluded that the county was not immune as a matter of law and held the jury should decide the question of immunity. The court remanded the cause for a new trial. *Id.* at 1090.

In a separate action, Ronald and Pamela Hout sued the Board of Commissioners of Steuben County, alleging that it negligently failed to place a warning sign for motorists approaching a "T" intersection. The county moved for summary judgment on the basis of governmental immunity for discretionary functions. The trial court denied the motion. In an interlocutory appeal, the Court of Appeals determined that such a decision was discretionary and directed entry of summary judgment for the county. *Board of Commissioners of County of Steuben v. Hout* (1986), Ind. App., 497 N.E.2d 597.

We grant transfer to resolve the conflict between districts.

I. History of Governmental Immunity

Governmental immunity developed as a common law doctrine of deference to the English monarchy. The doctrine had a dual basis in procedure and substance. Procedurally, allowing the king to be sued in his own courts was a contradiction of the king's sovereignty. Substantively, the divine right of kings proclaimed that "the king can do no wrong." Together, these formed the basis for the doctrine of sovereign immunity. *Prosser and Keeton on Torts*, § 131 at 1033 (5th Ed.1984).

The explanation for the initial acceptance of sovereign immunity in the United States is obscure. Early in the country's history, the U.S. Supreme Court noted that no suit may be commenced against the United States without its consent. *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat) 738, 842–43, 6 L.Ed. 204, 229 (1824). This principle was also recognized by American states, resulting in the rule that a suit may not be maintained against a state without its consent.

Several reasons for governmental immunity have been advanced: the absurdity of a wrong committed by an entire people, the idea that whatever the government did must be lawful, the theory that any government agent committing a wrongful act must have acted outside his authority, a reluctance to divert public funds to compensate for private injuries, and the inconvenience and embarrassment to the government if subjected to suit. W. Prosser, *The Law of Torts*, § 131 at 975 (4th Ed.1971).

Immunity for local governments such as cities, towns and counties, derived from a slightly different source. The municipal corporation had a dual character as both a subdivision of the state with governmental powers and a corporate body functioning as a private corporation. *Prosser and Keeton on Torts, supra,* at 1051. In its gov-

ernmental capacity, the municipal corporation was traditionally immune from liability.

At common law, courts drew distinctions based on the dual character of the municipal corporation as both a government and a corporation. A municipal corporation acted as a government when its exercised traditional governmental functions. Those acts performed by the municipality which were analogous to acts exercised by a private corporation were proprietary functions. E. McQuillan, *Municipal Corporations,* § 53.02 (3rd Ed.1984). A municipality was immune when exercising its governmental functions but was not immune when acting in its proprietary capacity. *See City of Kokomo v. Loy* (1916), 185 Ind. 18, 112 N.E. 994.

Though arising from municipal law, this distinction was applied to state immunity as well. To determine whether the act was a corporate or governmental undertaking, the manner in which the power was conferred, the obligations which naturally flowed from proprietorship and the purpose for which the power was granted and exercised were considered. *Aiken v. City of Columbus* (1906), 167 Ind. 139, 78 N.E. 657. Duties administered solely for public benefit, such as public health, charities, schools, protection of property against fire and maintenance of the peace were governmental undertakings.

The classification of functions as governmental or proprietary was elusive and uncertain and often led to inconsistent results. This Court abandoned the governmental/proprietary distinction in *Campbell v. State* (1972), 259 Ind. 55, 284 N.E.2d 733. In addressing the vitality of the doctrine of sovereign immunity in Indiana, this Court determined that the purpose for which the doctrine existed had long since vanished. *Id.* at 57–58, 284 N.E.2d at 736. The Court held the defense of sovereign immunity was no longer available to the state for either governmental or proprietary functions. *Id.* at 63, 284 N.E.2d at 737. The Court noted that while certain common law immunities, such as those for judicial and legislative decisions must remain, other in-

stances giving rise to state liability should be considered by the legislature. *Id.* at 61–62, 284 N.E.2d at 737. Two years later, the General Assembly enacted the Indiana Tort Claims Act. 1974 Ind.Acts, P.L. 142 § 1.

## II. Indiana Tort Claims Act

The Indiana Torts Claims Act (ITCA) provides that governmental entities may be liable for torts committed by its agencies and its employees. Ind.Code §§ 34–4–16.-5–1 to 20 (Burns 1986 Repl.). The ITCA protects governments from liability in certain circumstances. Among other more specific exceptions, "[a] government entity or an employee acting within the scope of his employment is not liable if a loss results from: (6) The performance of a discretionary function." Ind.Code § 34–4–16.5–3(6). Each of the cases at bar turns on the meaning of discretionary function.

## III. Approaches to Discretionary Function

■ Governmental immunity has generated a great deal of discussion in state and federal jurisdictions. Out of this debate, several approaches have emerged to determine whether an act is discretionary and thus entitled to immunity. While these approaches are instructive, the purpose and policy underlying governmental immunity must be the cornerstone for evaluating any claim of governmental immunity.

*A. The Ministerial/Discretionary Distinction.* Courts have attempted to distinguish immune governmental functions from those which expose the government to liability by describing activities as ministerial or discretionary.

A duty is discretionary when it involves on the part of the officer to determine whether or not he should perform a certain act, and if so in what particular way, and in the absence of corrupt motives, in the exercise of such discretion, he is not liable. His duties, however, in the performance of the act, after he has once determined that it shall be done, are ministerial, and for negligence in such performance, which results in injury, he may be liable in damages.

*Adams v. Schneider* (1919), 71 Ind.App. 249, 255–56, 124 N.E. 718, 720.

This common law distinction has found favor within our Court of Appeals since the ITCA passed. A duty is discretionary when the officer must determine whether he should perform a certain act, and, if so, in what manner. *Mills v. American Playground Device Co.* (1980), Ind.App., 405 N.E.2d 621. Performance of a discretionary function requires judgment and choice and involves what is proper and just under the circumstances. *Rodman v. City of Wabash* (1986), Ind.App., 497 N.E.2d 234. A ministerial act is performed in a prescribed manner, in obedience to the mandate of legal authority, without the exercise of judgment upon the propriety of the act. *Coghill v. Badger* (1981), Ind.App., 418 N.E.2d 1201, 1211 n. 9; *Galey v. Board of Commissioners* (1910), 174 Ind. 181, 183, 91 N.E. 593, 594; *Flowney v. Jeffersonville* (1861), 17 Ind. 169, 174. Ministerial acts "are those done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how or under what circumstances their acts are to be done." *Restatement, supra* § 895D comment h. Under this dichotomy any governmental act involving choice, judgment or decision-making is discretionary and immune from tort liability. Only those acts which require no judgment are ministerial and subject to tort liability.

This Court has recognized that the application of this standard is unclear. *Loy,* 185 Ind. at 23, 112 N.E. at 996. This difficulty has also been noted by scholars and commentators.

> It seems almost impossible to draw any clear and definite line, since the distinction, if one exists, can be at most one of degree. "It would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail."

W. Prosser, *The Law of Torts, supra* § 132 at 990 (quoting *Ham v. City of Los Angeles County,* 46 Cal.App. 148, 162, 189 P. 462, 468 (1920)). If discretionary functions included every act which involves any element of choice, judgment or ability to make responsible decisions, every act would fall within the exception. *Sterling v. Bloom,* 111 Idaho 211, 227, 723 P.2d 755, 771 (1986).

*B. Planning vs. Operation.* Another method of analysis has emerged primarily from interpretation of federal statutory immunity. In 1946, the United States gave consent to be sued in tort when it enacted the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1982) (FTCA). The FTCA generally exposes the government to tort liability but provides immunity for certain enumerated acts and for any claim based on the exercise of a "discretionary function or duty." 28 U.S.C. § 2680(a) (1982).

In interpreting discretionary functions, the U.S. Supreme Court has rejected the distinction between governmental and proprietary functions:

> Furthermore, the Government in effect reads the statute as imposing liability in the same manner as if it were a municipal corporation and not as if it were a private person, and it would thus push the courts into the "non-governmental" —"governmental" quagmire that has long plagued the law of municipal corporations. A comparative study of the cases in the forty-eight States will disclose an irreconcilable conflict. More than that, the decisions in each of the States are disharmonious and disclose the inevitable chaos when courts try to apply a rule of law that is inherently unsound.

*Indian Towing Co. v. United States,* 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48, 53–54 (1955).

Rather, the Supreme Court has determined which acts are entitled to immunity by distinguishing acts performed at the planning level from acts performed at the operational level. The federal government is not subject to liability when the alleged negligence arises from decisions which are "responsibly made at a planning rather than operational level and involved considerations more or less important to the practi-

cability" of the government's program. *Dalehite v. United States*, 346 U.S. 15, 42, 73 S.Ct. 956, 971, 97 L.Ed. 1427, 1444 (1953).

Thus, immunity for discretionary functions under this analysis does not extend to all acts involving choice or judgment. The FTCA protects the discretion of the executive or the administrator to act according to his or her judgment of the best course, a concept of substantial historical ancestry in American law. The discretionary function or duty "includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations." *Id.* at 35–36, 73 S.Ct. at 968, 97 L.Ed.2d at 1440.

*C. Separation of Power and Purposes of Governmental Immunity.* Ultimately, the determination of whether a governmental action is immune as a discretionary function must be based on the purposes and policy underlying governmental immunity. The early purposes of governmental immunity largely have been eliminated. *See Campbell*, 259 Ind. at 61, 284 N.E.2d at 736. While the historical reasons supporting the doctrine of sovereign immunity are no longer vital, governmental immunity under some circumstances still serves valid purposes. Common law forms of immunity, such as immunity for legislative and judicial functions, remain even absent statutory immunity. *Restatement, supra* § 895B, comment b at 402. Even as it abandoned the governmental/proprietary distinction, this Court acknowledged the continuing vitality of such forms of governmental immunity. *Campbell* 259 Ind. at 62–63, 284 N.E.2d at 737.

The policy underlying governmental immunity is the fundamental idea that certain kinds of executive branch decisions should not be subject to judicial review. The separation of powers doctrine forecloses the courts from reviewing political, social and economic actions within the province of coordinate branches of government. In this way, the discretionary function exception articulates "a policy of preventing tort actions from becoming a vehicle for judicial interference with decision-making that is properly exercised by other branches of the government...." *Blessing v. United States*, 447 F.Supp. 1160, 1170 (E.D.Penn. 1978) (interpreting FTCA discretionary function exception). *See also Carter v. City of Stuart*, 468 So.2d 955, 956 (Fla. 1985) (discretionary functions immune because "coordinate branches of government may not be subject to scrutiny by judge or jury as to the wisdom of their performance") (quoting *Commercial Carrier Corp. v. Indiana River County*, 371 So.2d 1010, 1022 (Fla.1979)); *Ostendorf v. Kenyon*, 347 N.W.2d 834 (Minn.App.1984) (purpose of discretionary function exception is that courts are not an appropriate forum to review and second guess acts of government which involve exercise of judgment); *Whitney v. City of Worcester*, 373 Mass. 208, 366 N.E.2d 1210 (1977) (judicial abstention from policy formation of coordinate branches required because inquiries into political discretion would jeopardize quality and efficiency of government); *Industrial Indemnity Co. v. Alaska*, 669 P.2d 561 (Alaska 1983) (basic policy decisions are vested in politically responsive branches).

Governmental immunity for discretionary functions also avoids inhibiting the effective and efficient performance of governmental duties. Policy-making activities lie at the heart of governance and such essential acts should not be subject to judicial second-guessing or harassment by the actual or potential threat of liability litigation. Tort immunity for basic planning and policy-making functions is necessary to avoid the chilling effect on the ability of the government to deal effectively with difficult policy issues which it confronts daily. *C & D Partnership v. City of Gahanna*, 15 Ohio St.3d 359, 474 N.E.2d 303 (1984).

Moreover, the traditional tort standard of negligence does not provide an adequate basis for evaluating certain governmental decisions. As the district court in *Blessing* said:

[T]he judiciary confines itself ... to adjudication of facts based on discernible objective standards of law. In the context of tort actions ... these objective stan-

dards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not unreasonableness but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions. *Blessing*, 447 F.Supp. at 1170–72. *See also Wainscott v. State*, 642 P.2d 1355 (Alaska 1982) (discretionary exception recognizes that courts are ill-equipped to investigate and balance numerous factors in legislative or executive decisions); *Cairl v. State*, 323 N.W.2d 20 (Minn.1982) (negligence action not an appropriate forum to review exercise of judgment by other branches).

■ Immunity for discretionary functions, however, does not protect all mistakes of judgment. The discretionary function exception insulates only those significant policy and political decisions which cannot be assessed by customary tort standards. In this sense, the word discretionary does not mean mere judgment or discernment. Rather, it refers to the exercise of political power which is held accountable only to the Constitution or the political process. *Miller v. United States*, 583 F.2d 857, 866–67 (6th Cir.1978).

This interpretation of the discretionary function exception also comports with the *Restatement (Second) of Torts:*

> Even when a State is subject to tort liability, it and its governmental agencies are immune to liability for acts and omissions constituting
>
> (a) the exercise of a judicial or legislative function, or
>
> (b) the exercise of an administrative function involving the determination of fundamental government policy.

*Restatement, supra* § 895B(3).

The distinction between planning and operational functions relates well to the purposes of governmental immunity. It requires an inquiry into the nature of the governmental act and the decision-making process involved. Merely labeling an action as planning or operational, without more, cannot pass for analysis. The critical inquiry is "not merely whether judgment was exercised but whether the nature of the judgment called for policy considerations." *Blessing*, 447 F.Supp. at 1178 (quoting *Griffin v. United States*, 500 F.2d 1059, 1064 (3rd Cir.1974)). In many cases, courts have looked to the purposes of immunity in determining whether an act is planning or operational.

Under the planning/operational dichotomy, the type of discretion which may be immunized from tort liability is generally that attributable to the essence of governing. *Enghauser Mfg. Co. v. Eriksson Engineering*, 6 Ohio St.3d 31, 451 N.E.2d 228 (1983). Planning activities include acts or omissions in the exercise of a legislative, judicial, executive or planning function which involves formulation of basic policy decisions characterized by official judgment or discretion in weighing alternatives and choosing public policy. *Marrek v. Cleveland Metroparks Board. of Commissioners*, 9 Ohio 3d 194, 459 N.E.2d 873 (1984). Government decisions about policy formation which involve assessment of competing priorities and a weighing of budgetary considerations or the allocation of scarce resources are also planning activities. *Industrial Indemnity Co.*, 669 P.2d at 564–65.

The distinction between planning and operational functions is a standard, rather than a precise rule. The focus must remain on the policy underlying governmental immunity. If the act is one committed to coordinate branches of the government involving policy decisions not reviewable under traditional tort standards of reasonableness, the government is immune from liability even if the act was performed negligently.

IV. Policy–Based Analysis of Immunity

The ministerial/discretionary test does not advance the public policy of government immunity because it does not consider the type of decision protected by immunity. Rather, it considers only the resulting conduct and attempts to label that conduct. The ministerial/discretionary test defines "discretionary" in the negative: anything which is non-ministerial is discretionary. The test does not require an affirmative finding that the governmental action arose

from the type of policy-making decision protected by governmental immunity. It operates by process of elimination, removing ministerial acts from the more general category of discretionary, immune acts.

The discretionary function exception of the ITCA removes discretionary acts from the broader spectrum of liability. This requires an affirmative finding that the governmental act is of the type intended to be protected by immunity. The planning/operational test provides a better framework for such an analysis. This test advances the policy underlying governmental immunity and allows consideration of the nature of the challenged decision. In defining discretionary acts immune under the ITCA, we reject the ministerial/discretionary test in favor of the planning/operational test, to be applied in light of the policy and rational supporting governmental immunity.

■ The issue of whether an act is discretionary and therefore immune is a question of law for the court's determination. The question may require an extended factual development[1], but the essential inquiry is whether the challenged act is the type of function which the legislature intended to protect with immunity. This determination should be made by the court.

Discretionary immunity must be narrowly construed because it is an exception to the general rule of liability. *Larson v. Ind. School Dist. No. 314*, 289 N.W.2d 112 at 121 (Minn.1979). The governmental entity seeking to establish immunity bears the burden of proving that the challenged act or omission was a policy decision made by consciously balancing risks and benefits. *See Little v. Wimmer*, 303 Or. 580, 739 P.2d 564 (1987); *Johnson v. State*, 69 Cal. 2d 782, 794 n. 8, 447 P.2d 352, 361 n. 8, 73 Cal.Rptr. 240, 249 n. 8 (1968).

■ In deciding whether the function is the type intended to benefit from immunity, the court should look to the purposes of immunity to determine whether those purposes would be furthered by extending immunity to the act in question. Factors which would, under most circumstances, point toward immunity, include:

1. The nature of the conduct—
   a) Whether the conduct has a regulatory objective;
   b) Whether the conduct involved the balancing of factors without reliance on a readily ascertainable rule or standard;
   c) Whether the conduct requires a judgment based on policy decisions;
   d) Whether the decision involved adopting general principles or only applying them;
   e) Whether the conduct involved establishment of plans, specifications and schedule; and
   f) Whether the decision involved assessing priorities, weighing of budgetary considerations or allocation of resources.

2. The effect on governmental operations—
   a) Whether the decision affects the feasibility or practicability of a government program; and
   b) Whether liability will affect the effective administration of the function in question.

3. The capacity of the court to evaluate the propriety of the government's action—
   Whether tort standards offer an insufficient evaluation of the plaintiff's claim.

Immunity assumes negligence but denies liability. Thus, the issues of duty, breach and causation are not before the court in deciding whether the government entity is immune. If the court finds the government is not immune, the case may yet be decided on the basis of failure of any ele-

---

1. "In some cases, however, fact-finding on the nature of the acts complained of may be necessary before the court has an adequate basis to decide whether they are 'discretionary.'" *Miller v. United States*, 583 F.2d 857, 866 (6th Cir.1978) (motion to dismiss remanded for reconsidera-

tion). While most federal jurisdictions decide the question of immunity as a jurisdictional question on a motion to dismiss, *Blessing*, 447 F.Supp. at 1167 n. 6, the analysis is analogous to the question of immunity as a defense in a motion for summary judgment.

ment of negligence. This should not be confused with the threshold determination of immunity. *See Prosser and Keeton, The Law on Torts, supra* § 131 at 1043.

### V. Resolution of the Cases

Both Peavler and Hout allege that the respective defendant counties were negligent for failing to place traffic control devices warning motorists of dangerous sections of county roads. Both counties answer that such a decision is a discretionary function and that each county is therefore immune from any liability arising from a failure to place a warning sign.

The counties argue that, while failure to maintain a previously posted traffic sign is non-discretionary, the original decision to install one is discretionary. Clearly, there are cases on either end of the spectrum which will fall automatically into the category of discretionary or non-discretionary functions. Such is the case of the failure to properly maintain a warning sign. It does not follow, however, that the decision to post such a sign is automatically discretionary.

While warning signs are posted to further the safety of the community, they are also regulatory devices, and they may have a penal effect on violators. While the *Indiana Manual on Uniform Traffic Control Devices* offers guidelines for warning signs, the Manual does not "mandate the use of any control devices or procedures at a particular location." Indiana Department of Highways, *Indiana Manual on Uniform Traffic Control Devices,* § 1A–1 (1988). The decision may involve gathering data regarding traffic flow, average speed, and other factors. It may also involve weighing priorities to determine if safety considerations outweigh inconveniences to individual motorists, and determining whether uniformly marking all similar sites can be accommodated within a given budget.

■ While potential liability may have some effect on this government function, the government is still shielded by immunity for actual policy-making decisions regarding warning signs. Thus, the govern-ment is exposed to liability only when no policy oriented decision-making process has been undertaken.

Tort standards of reasonableness do not provide an adequate basis for evaluating the failure to erect a warning sign if that failure arises from an actual, affirmative policy decision. If the decision is based on professional judgment, however, rather than policy oriented decision-making, traditional tort standards for professional negligence afford a basis for evaluation. Thus, a county's considered decision to entrust placement of traffic control devices to a traffic engineer is not reviewable under tort standards, while the engineer's subsequent decisions as to warning signs are reviewable under tort standards of professional negligence. *See Driscoll v. United States,* 525 F.2d 136 (9th Cir.1975).

Considering the nature of the conduct, the effect on government operations, and the capacity of the courts to evaluate the propriety of the government's actions, we cannot say that governmental policy is so clearly implicated by decisions regarding placement of warning signs that all such decisions are discretionary under the ITCA as a matter of law. Had the legislature intended for such an act to be immune outside the parameters of the discretionary function exception, it could have provided specific immunity. *See e.g.*, Iowa Code Ann. § 668.10, subd. 1 (West 1985).

The discretionary nature of a decision to place a warning sign must be determined case by case. Immunity may be established by government defendants who can show that the challenged decision was discretionary because it resulted from a policy oriented decision-making process. If the counties engaged in this decision-making process, the courts may not judge the wisdom of their decisions. That judgment is left to the political process.

■ The defendants here seek to establish the defense of immunity. Each bears the burden to show that a policy decision, consciously balancing risks and benefits, took place. Neither defendant county presented evidence to show that its decision

regarding the warning signs was the result of such a process.

The trial court in *Peavler* submitted the case to the jury with an instruction that any duty on the part of the county to post warning signs was discretionary. While the county might well have been entitled to a verdict on negligence or contributory negligence issues, the Court of Appeals concluded it could not say that such error was harmless because the jury's verdict may have been based on the erroneous instruction. *Peavler*, 492 N.E.2d at 1090. We agree.

The *Hout* case was decided on the basis of a motion for summary judgment. The record before us consists of the complaint and answer, the parties' interrogatories, the motion for summary judgment and motion in opposition together with supporting memoranda. The county did not present evidence that the "T" intersection had been considered by the board of commissioners or that is was part of a policy process in which elected officials played a key role. It did not introduce minutes of board meetings where the need for a warning sign was rejected or present testimony of commissioners regarding the decision-making process involved. It did not introduce a comprehensive ordinance, studies or surveys of the area in question which showed that this area had been evaluated and a warning sign had been deemed unnecessary.[2]

The county presented no evidence from which we can evaluate the nature of the board's conduct in failing to erect a warning sign, the potential effect of liability on county operations, or the capacity of the court to judge the county's action. We cannot determine from this record whether the failure to erect a warning sign arose from a judgment based on policy considerations. The record presented therefore does not support the conclusion that no question of material fact remains regarding the

county's immunity. The excellent opinion of Judge Sand in denying the county's motion was correct.

Failure to engage in this decision-making process does not automatically result in liability. The county simply is not shielded by immunity if the failure to erect a warning sign did not result from a policy decision consciously balancing risks and advantages.

If the county in either case can present evidence that the commissioners engaged in a policy oriented decision-making process and determined, for whatever reason, that a warning sign should not be posted, the courts will not second-guess their judgment. On remand, the counties bear the burden to demonstrate the discretionary nature of the decision in order to prevail on a claim of immunity.

The opinions of the Court of Appeals are vacated. The judgment of the trial court in *Peavler* is reversed. The judgment of the trial court denying summary judgment in *Hout* is affirmed. Both causes are remanded for further proceedings consistent with this opinion.

DeBRULER, GIVAN and DICKSON, JJ., concur.

PIVARNIK, J., dissents with opinion.

PIVARNIK, Justice, dissenting.

I dissent to the consolidated majority opinion in both of these cases since it is in conflict with the law on this subject found in opinions by this court and the court of appeals, and is in direct contravention of a statutory scheme enacted by the Legislature on this very subject.

Judge Staton, writing for a unanimous court, clearly pointed this out and found the Board of Commissioners of Steuben County were immune from liability as a matter of law. In *Campbell v. State* (1972), 259 Ind. 55, 284 N.E.2d 733, this

---

**2.** These cases are therefore distinguished from *City of Tell City v. Noble* (1986), Ind.App., 489 N.E.2d 958, where there was evidence that a comprehensive ordinance existed which delineated intersections which should be marked. The intersection in question was not included in

the ordinance. From this, we conclude that the City considered the intersection in question in adopting the comprehensive ordinance and determined that the intersection should not be marked. The wisdom of this decision therefore cannot be reviewed by the courts.

court abolished a great deal of governmental immunity, but not all of it. Governmental entities remained immune from liability for, among other things, judicial acts, legislative acts, and discretionary acts. As Judge Neal pointed out in *City of Tell City v. Noble* (1986), Ind.App., 489 N.E.2d 958, *trans. denied,* IC 34–4–16.5–3 contains specifications of immunity under the Tort Claims Act, including "the performance of a discretionary function." There is no difficulty in determining the intention of the Legislature in using the language in "performance of a discretionary function" since it was a term used and well understood in the law of this jurisdiction and others. In *Brinkmeyer v. City of Evansville* (1867), 29 Ind. 187, this court provided that if duties imposed are of a legislative nature or depend on judgment, the public entity is not responsible in damages either for failing to perform or error in performance. In 1919, the Indiana Appellate Court held in *Adams v. Schneider* (1919), 71 Ind.App. 249, 255–56, 124 N.E. 718, 720:

A duty is discretionary when it involves on the part of the officer to determine whether or not he should perform a certain act, and, if so, in what particular way, and in the absence of corrupt motives in the exercise of such discretion he is not liable. His duties, however, in the performance of the act, after he has once determined that it shall be done, are ministerial, and for negligence in such performance, which results in injury, he may be liable in damages. (citations omitted)

The majority only generally refers to the discretionary function exception of the Indiana Tort Claims Act and fails to mention the legislative expression regarding the manner in which roads and highways will be signed. Yet the majority states that whether an act is discretionary and therefore immune is a question of law for the court's determination and the essential inquiry is whether the challenged act is the type of function which the Legislature intended to protect with immunity. In *Tell City v. Noble,* the Court of Appeals pointed out that a statutory scheme exists in Indiana, governing the placement of traffic markers on streets, roads, and highways, and the legal effect of such placement, and the enforcement of adherence to those traffic markers. *Tell City* was very similar to both of the causes before us but it involved an allegation of negligence against the city for failure to place a stop sign at an allegedly dangerous intersection rather than the failure in both of the instant cases to place warning signs. The *Tell City* court stated:

That scheme is contained in IND.CODE 9–4, the Uniform Act Regulating Traffic on Highways. It applies to all highways, roads and streets, including those in residential subdivisions, regardless of who maintains them. IND.CODE 9–4–1–22. The Act requires the adoption, by the Indiana State Highway Commission, of a manual specifying a uniform system for traffic control devices for use on all roads in the state. IND.CODE 9–4–1–30. The Manual, entitled The Indiana Manual on Uniform Traffic control Devices for Streets and Highways, must be adhered to by all governmental agencies responsible for the signing, marking and erection of any traffic control device on any street or highway in the state. IND. CODE 9–4–2–1. All such devices shall conform to the standards and specifications set forth in the Manual. IND. CODE 9–4–3.1–1. Control devices and signals are defined as "[all] signs, markings or devices, including railroad advance warning signs, ... placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning and guiding traffic." IND.CODE 9–4–1–19. Any unauthorized sign on a street or highway is forbidden. IND.CODE 9–4–1–38.

Although the provisions of IND.CODE 9–4 are applicable throughout the state, local authorities may adopt by ordinance additional traffic regulations with respect to streets and highways under their jurisdiction. However, any additional traffic regulation must not conflict with or duplicate the provisions of the statute. IND.CODE 9–4–1–27. "Local authorities" is defined as "[e]very county, municipal, and other local board or

body having authority to adopt local police regulations under the constitution and laws of this state." IND.CODE 9–4–1–13. Such powers shall be exercised by ordinance. IND.CODE 36–1–3–6. Local authorities have the power, with respect to streets and highways under their jurisdiction and within the reasonable exercise of the police power, to regulate traffic by means of traffic control signals, to designate one-way streets, to designate any highway as a through highway, to require that all vehicles stop before entering or crossing any highway, to designate any intersection as a STOP intersection and to require that all vehicles stop at one or more entrances to a STOP intersection. IND.CODE 9–4–1–28. Thus, not only does IND.CODE 9–4–1–28 grant local authorities the power to regulate traffic when not pre-empted by the state, but it clearly contemplates, along with IND.CODE 9–4–1–81, the continued existence of some unmarked intersections. IND.CODE 9–4–1–81 provides as follows:

"(a) When two [2] vehicles approach or enter an intersection from different highways at approximately the same time, the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right.

(b) The right-of-way rule in subsection (a) is modified at through highways and otherwise as stated in this chapter."

In regard to erecting STOP or YIELD signs, IND.CODE 9–4–1–110 provides:

"(a) The department of highways with reference to state highways, and high way routes through cities, and local authorities with reference to other highways under their jurisdiction, may, upon an engineering and traffic investigation, designate through highways and erect stop or yield signs at specific entrances thereto or may designate any intersection as a stop or yield intersection and erect like signs at one or more entrances to such intersection.

(b) Every stop sign and yield sign shall be manufactured and installed in conformance with the Indiana manual on uniform traffic control devices for roads and streets as provided under section 30[9–4–1–30] of this chapter and under IC 9–4–2–1.

(c) Every driver of a vehicle shall stop or yield in obedience to any such signs as the case may be, before entering such intersection except when directed to proceed by a police officer or traffic control signal."

Throughout the Act it is stated in many ways and in many sections that local authorities who are responsible for roads and streets may, pursuant to an engineering and traffic investigation, determine by ordinance that traffic should be regulated and signs posted. *See, e.g.,* IND.CODE 9–4–1–70 concerning hazardous passing; IND.CODE 9–4–1–75 concerning turning; IND.CODE 9–4–1–71 concerning one-way streets; IND.CODE 9–4–1–74 concerning the regulation of freeways; IND.CODE 9–4–1–83 concerning STOP and YIELD signs at through highways; and IND.CODE 9–4–1–86 concerning pedestrians at cross walks. In addition, adherence to official traffic control devices is mandated by statute. IND.CODE 9–4–1–33. In fact, disobedience to signs posted in accordance with the various statutory sections is either a Class C misdemeanor or a Class C infraction. IND.CODE 9–4–1–127. Throughout the statutes cited above, the granting of traffic control powers to the State Highway Commission and to local authorities is preceded by the word "may." The word "may" ordinarily indicates a permissive condition and discretion. *Noble v. City of Warsaw* (1973), 156 Ind. App. 618, 297 N.E.2d 916, *trans. denied.* As the Manual so states " 'may' is meant to be a permissive and not mandatory condition. No specific requirements are intended in the design or use of the device." Manual on Uniform Traffic Control Devices for Streets and Highways, Sec. 1A5, p. 1A–4 (1981 ed.).

The Manual, *supra,* at 2B2 states that:

"[b] because the STOP sign causes a substantial inconvenience to motorists, it

should be used only where warranted. A STOP sign *may* be warranted at an intersection where one or more of the following conditions exist:

(1) Intersection of a less important road with a main road where application of the normal right-of-way rule is not recommended by field investigation.

(2) Street entering a through highway or street.

(3) Unsignalized intersection in a signalized area.

(4) Other intersections where a combination of high speed, restricted view and accident record *may* indicate a need for control by the STOP sign."

(Our emphasis.)

Should the legislature have intended to make the placing of STOP signs mandatory, it would have used the word "shall." *See Sharton v. Slack* (1982), Ind.App., 433 N.E.2d 856. Of course it would have been impractical for the legislature to do so, since the signing of streets and highways clearly requires judgment and discretion.

*Tell City*, 489 N.E.2d at 960–62. It thus is clear that the Legislature intended the discretionary function exception to apply to the governmental act of signing streets and roadways and was the type of act intended to be protected by immunity. The majority seems to infer that with respect to every point in every road and street in this state, whether it is a curve, a hill, an intersection, or any other type of terrain, the governing body must be able to show that it had an affirmative hearing and made express and affirmative findings that a sign was not necessary at that particular point. Obviously, this is a burden no governing body can hope to carry and certainly is not what the Legislature intended. The governing body is to determine where, when, and how, a particular point is to be signed, and once having done so then becomes responsible for any negligence in the manner in which it is done. This is an affirmative action and not a negative one where there must be some finding as to what led the governing body not to put a sign at some other point at which they are challenged.

Since the Legislature, as the policy making body in this State, has well set out this scheme, I see no point in adopting a new set of standards which the majority has characterized as the planning/operational test. Although some jurisdictions have found it helpful, I find it no less confusing than the method presently used. I also feel we should not amend this statutory scheme to one we presume to be better. It is true the discretionary/ministerial test has been a difficult one to apply but I believe that is because the subject matter is inherently difficult and requires the courts to make a case by case determination. I do not feel the planning/operational test will simplify it. Further, requiring the governing body to affirmatively show a decision making procedure at any particular point in which a sign was not placed, is impracticable, unworkable, and complicates the problem far beyond the complexities we face in applying it now. I think it is unfortunate the Indiana Supreme Court has taken upon itself a process of legislating policy in this field that has been dealt with by our legislature. This is the proper function of the legislature as direct representatives of the people. The affect of the holding of the majority is to virtually wipe out all governmental immunity and make the taxpayers more vulnerable to financing losses on our streets and roads regardless of clear liability in the actual tortfeasor. The clear and reasonable balance in our legislative scheme and our law has now become very unbalanced.

I would grant transfer in *Peavler v. Board of Commissioners of Monroe County*, vacate the opinion of the Court of Appeals and affirm the trial court. I would deny transfer in *Board of Commissioners of the County of Steuben v. Hout*.