**CITY OF CROWN POINT,**
Appellant–Defendant,

v.

**Christina RUTHERFORD,**
Appellee–Plaintiff.

No. 45A04–9401–CV–19.

Court of Appeals of Indiana,
Fourth District.

Sept. 29, 1994.

Rehearing Denied Nov. 14, 1994.

Martin D. Hoke, Charles C. Hoppe, Jr., Knight, Hoppe, Fanning & Knight, Schererville, for appellant.

Barry D. Sherman, Joseph P. Allegretti, Sherman & Allegretti, Hammond, for appellee.

## STATEMENT OF THE CASE

RILEY, Judge.

Defendant–Appellant the City of Crown Point (Crown Point) appeals from a judgment for Plaintiff–Appellee Christina Rutherford (Rutherford) for personal injury damages following a slip and fall. We reverse.

## ISSUES

Two issues were presented for our review. Since we reverse, we reach only one issue:

Whether the City of Crown Point is immune from liability for Rutherford's injuries pursuant to the Indiana Tort Claims Act.[1]

## FACTS AND PROCEDURAL HISTORY

This suit arose from a slip and fall incident that occurred on a city sidewalk located in front of 645 South Main Street in Crown Point, Indiana. On February 23, 1991, 79 year old Rutherford left her apartment and walked to the public library. Rutherford lived about ten blocks from the library. On Rutherford's return trip from the library she tripped and fell on a portion of broken sidewalk. As a result of her fall, she sustained injuries consisting of fractures to her left cheek bone, left arm and wrist, suffered considerable pain and incurred medical expenses. Rutherford alleged in her complaint that the proximate cause of her fall was "a dangerous condition of the public sidewalk consisting of broken portions of sidewalk ... which constituted a hazard to the safety of pedestrians walking upon the sidewalk." (R. 2–3).[2] Rutherford further alleged that the "City of Crown Point ... knew about or, with the exercise of reasonable inspection, should have discovered the dangerous condition before [her] fall and injury." (R. 3).

Therefore, Rutherford alleged that the City was negligent for allowing such a condition to remain. Crown Point denied all material allegations in its answer and raised five affirmative defenses alleging that Rutherford was contributorily negligent and that the City was immune from liability pursuant to various provisions of the Tort Claims Act.

The case proceeded through discovery and Crown Point's motion for summary judgment and supplemental motion for summary judgment. Both motions were denied and the case went to trial. At the close of Rutherford's case, Crown Point moved for judgment on the evidence pursuant to Ind.Trial Rule 50 arguing that Rutherford was contributorily negligent. The court denied the motion stating that Rutherford had presented evidence on each element of her claim and the issue of contributory negligence was a question for the jury. At the close of the evidence, Crown Point interposed its second motion for judgment on the evidence reasserting its contributory negligence argument and arguing also that it was immune from liability pursuant to the Tort Claims Act. Specifically, Crown Point asserted in a lengthy and thorough argument to the court that the discretionary immunity provision of I.C. 34–4–16.5–3(6) immunizes it from tort liability. Crown Point cited *Peavler v. Bd. of Comm'rs of Monroe County* (1988), Ind., 528 N.E.2d 40, for the proposition that since policy making considerations were made during the planning and implementation phases of the sidewalk project, Crown Point should be cloaked with immunity. In its ruling, the trial court characterized the issue as whether the City made a conscious policy making decision not to repair the specific segment of sidewalk at issue, and applying *Peavler*, whether that decision was protected by immunity. *Id.*

---

1. The Indiana Tort Claims Act is codified at IND.CODE 34–4–16.5–1 through I.C. 34–4–16.5–22 (1993 Supp.).

2. Rutherford's complaint was originally filed against the City of Crown Point and the abutting homeowners, Edith and Leslie Conquest. The Conquests were dismissed from the action pursuant to a trial court order dated May 28, 1993. The trial court concluded that a municipality cannot delegate the responsibility to maintain sidewalks to abutting landowners, and cannot create liability between abutting landowners and third parties using the sidewalk. The trial court correctly decided this issue. *See Carroll v. Jobe*, 638 N.E.2d 467 (Ind.App.1994) (We considered a Crown Point ordinance, City of Crown Point Code, § 93.04, and held that "an ordinance requiring an abutting landowner to repair and maintain a public sidewalk does not create a duty to pedestrians using the sidewalk, absent an express provision to the contrary.") 638 N.E.2d at 470.

The court found that the City was not entitled to immunity and denied Crown Point's motion for judgment on the evidence.

The jury returned a verdict against Crown Point in the amount of $93,714.04. Judgment on the verdict was entered accordingly. Crown Point appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

■ On appeal, a general judgment will be sustained upon any theory consistent with the evidence. *Emmons v. Brown* (1992), Ind.App., 600 N.E.2d 133, 134. We will neither reweigh the evidence nor rejudge the credibility of the witnesses. *Id.*

### II. Indiana Tort Claims Act

Crown Point contends that, as a governmental entity, it is immune from liability. Specifically, the City argues that it is entitled to discretionary immunity pursuant to the Indiana Tort Claims Act. Crown Point relies on the following language of nonliability in the Act: "A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from: ... (6) the performance of a discretionary function." I.C. 34–4–16.5–3(6). This case turns on the meaning of discretionary function.

### A. The Peavler Standard

The Indiana supreme court first construed section 34–4–16.5–3(6) of the Tort Claims Act in *Peavler*, 528 N.E.2d 40, wherein it adopted the "planning-operational test". The standard dictates that a governmental entity will not be held liable for negligence arising from decisions which are made at a planning level, as opposed to an operational level. We recently commented on the test as follows:

> Under the [planning-operational] test, if the decision of the governmental entity was a 'planning' activity, that is a function involving the formulation of basic policy characterized by official judgment, discretion, weighing of alternatives, and public policy choices, then the decision is discretionary and immune under I.C. 34–4–16.5–3(6). Government decisions about policy

formation which involve assessment of competing priorities, a weighing of budgetary considerations, or the allocation of scarce resources are also planning activities. On the other hand, if the function is 'operational', for example decisions regarding only the execution or implementation of already formulated policy, the function is not discretionary under the statute and no immunity attaches.

*Voit v. Allen County* (1994), Ind.App., 634 N.E.2d 767, 769–70.

■ In adopting this test for determining whether a governmental entity has engaged in a discretionary function and is therefore immune from liability, the *Peavler* court discussed the policy underlying governmental immunity. *Peavler*, 528 N.E.2d 40. The court said that the policy underlying discretionary immunity is based on the separation of powers between the coordinate branches of government and the notion that we should prevent tort actions from becoming a vehicle for judicial review of government policy-based decisions. *Id.* at 44. Inherent in this logic is the basic recognition that the courts are ill-equipped to evaluate the various factors determinative of legislative and executive decisions. *Id.* at 45. In explaining the distinction between planning and operational functions the court said:

> It requires an inquiry into the nature of the governmental act and the decision-making process involved. Merely labeling an action as planning or operational, without more, cannot pass for analysis. The critical inquiry is not merely whether judgment was exercised but whether the nature of the judgment called for policy considerations.

*Id.* The critical inquiry is on the policy underlying government immunity. *Id.* Immunity for discretionary functions is not absolute. The exception protects only those significant policy and political decisions which cannot be assessed by customary tort standards. *Id.* This is because this type of exercise of political power is accountable only to the political process or the Constitution. *Id.* As the United States District Court said

in its interpretation of the Federal Tort Claims Act discretionary function provision:

the judiciary confines itself ... to adjudication of facts based on discernible objective standards of law. In the context of tort actions ... these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not unreasonableness but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.

*Peavler,* 528 N.E.2d at 44–45 (quoting *Blessing v. United States,* 447 F.Supp. 1160, 1170 (E.D.Penn.1978)).

 The question of whether an act is discretionary is a question of law for the court. *Peavler,* 528 N.E.2d at 46. The court's decision should turn on whether the challenged act is the type of function that the legislature intended to shield from liability. *Id.* Discretionary immunity must be narrowly construed because it is an exception to the general rule of liability. *Id.*

### B. Application of the Standard

In order to prevail on its claim of immunity, Crown Point has the burden of proving that its decision to implement the sidewalk rehabilitation project and target specific areas while excluding others was a policy decision made by consciously balancing risks and benefits.

The record reveals that Crown Point financed the rehabilitation of its sidewalks from two funds. The first is the HUD program which is based on a community development block grant from the United States Department of Housing and Urban Development. HUD gives Crown Point a certain number of dollars every year to fund public works projects in low to moderate income areas. Crown Point has recently used the HUD monies for rehabilitation of its sidewalks in those income areas. The City has a second program called the 50–50 program which was designed to operate as a gap-filler to the HUD program. Under the 50–50 program, the Board of Public Works targets a particular area for sidewalk rehabilitation

and the Board and the residents split the cost of sidewalk repairs.

The trial court made lengthy comments before denying Crown Point's motion for judgment on the evidence. The court characterized the issue before it as whether the City is immune for not having repaired the sidewalk in front of 645 South Main Street. Following *Peavler,* the court summarized the evidence and denied the motion. Specifically, the court concluded that there was no evidence that the City ever considered whether to repair the specific segment of sidewalk at issue. The court reasoned that since the City never specifically considered repairing the sidewalk, it never engaged in the type of policy-oriented decision that would insulate it from liability under *Peavler.* There was similarly no evidence of planning or budgetary considerations concerning this specific location. Further, there was no evidence on what effect the repair of this sidewalk would have on other sidewalk programs. (R. 1172–1179).

We find that the trial court's characterization of the issue and its application of *Peavler* was overly narrow. The trial court's emphasis on the City's failure to consider repair of the specific segment of sidewalk is misplaced. The correct analysis takes a more general approach. As we recently said in *Voit,* 634 N.E.2d 767:

In the case of omissions, a conscious balancing may be demonstrated by evidence showing that the governmental entity considered improvements of the general type alleged in plaintiff's complaint.... Where this is shown, there is no need for the entity to demonstrate that it considered and rejected the specific improvements alleged.

*Id.* at 770. In *Voit,* plaintiffs sought to hold the County Highway Department liable for its failure to make improvements in Adams Center Road. We based our decision on the City's systematic process for determining which improvements would be made to Allen County highways generally. There was no evidence that the City had ever specifically considered and rejected improvements on Adams Center Road. We found that it was sufficient for the City to demonstrate that it

consciously engaged in decision making regarding the general type of improvements alleged in plaintiff's complaint. *Voit*, 634 N.E.2d at 771.

■ The correct statement of the issue is whether Crown Point's management of its sidewalk rehabilitation program resulted from decisions involving the formulation of basic policy and from a balancing of risks and benefits. Applying the planning-operational test, we have no hesitation in concluding that Crown Point's actions were of the general type contemplated to be shielded with immunity provided that they were the result of a conscious policy oriented analysis.

The record reveals that Crown Point had instituted a comprehensive scheme to renovate its sidewalks. The key decision-makers contemplated and balanced public policy factors and weighed budgetary considerations in the allocation of resources. There was considerable testimony regarding the decision to target school zones, children's play areas and other high traffic zones such as the town square. Further, the policy was focused on utilizing the 50–50 program to complement the HUD program. As indicated by the record, the resources to achieve the goal of complete sidewalk renovation were not available. The City attempted to utilize the funds that were available to it in the most effective way and in a way that would serve the largest number of its citizenry. There were competing interests, and the City did consider these competing interests. As Mayor Forsythe testified, his administration decided to utilize approximately 95% of the HUD funds to finance the sidewalk rehabilitation program. The Mayor, together with the county council and the HUD authorities, targeted a specific area for sidewalk rehabilitation based on HUD qualifications and policy concerns of Crown Point. Once targeted, 50–50 monies were utilized to fill in the gaps for households that did not qualify for HUD funding. The City implemented this policy in an effort to use the allocated money in the most effective manner.

Frank Banyai, the city engineer for Crown Point, testified that the Mayor's office made the decisions regarding which sidewalks would be repaired. The administration usu-ally concentrated on the sidewalks radiating from the courthouse because they were the most heavily travelled and because they usually qualified for HUD funding. Banyai further testified that the decisions were made with the intent of the City getting "the most bang for the buck." (R. 711). The Board of Public Works, which is comprised of the Mayor and two appointees, designates the areas to target with 50–50 monies. Banyai testified that he and two appointees canvass the City to determine eligibility for the 50–50 program. Banyai makes preliminary notes on a legal pad and the more detailed engineering work takes place once a board decision is made to include the area in the program.

■ Former Mayor of Crown Point, James Forsythe, testified regarding a comprehensive plan instituted in Crown Point for sidewalk rehabilitation and repair. Forsythe, in cooperation with the city county council and the HUD authorities decided to use the HUD funds for the sidewalk program. The City tried to implement policies that would best serve the people of Crown Point. For example, the initial target areas were school zones, parks and areas that had heavy pedestrian traffic. When discussing the 50–50 program specifically, Forsythe said that he was faced with competing interests when deciding how to allocate the funding. The record reveals the following colloquy between defense counsel and Forsythe:

Q. Did you have to consider advantages and disadvantages of this sidewalk replacement program?

A. Well, you do. You always do that because the advantage is certainly not only the upgrade because of the looks of the property and stuff and the welfare of the neighborhood, but it's also a safety thing.

Q. Did this plan involve the operation of a comprehensive scheme?

A. That was the plan we had. We would start and work our way up in the area for the most part.

Q. Did your adoption of the sidewalk replacement program involve the estab-

lishment of schedule specifications and planning?

A. Yes. The engineer would make up specifications and then the Board of Works would go through a bidding process and then schedule it for the following year....

Q. Did the decisions that were made during this period of time involve a weighing (sic) on budgetary considerations?

A. The weighing (sic) of budgetary considerations came on the fifty-fifty program, because the HUD money ... was more or less a narrow field of how you could spend it and wanted to get the biggest bang for the buck so to speak with using the HUD money effecting the maximum number of people and coming in (sic) on the fifty-fifty program allocation [$20,000] a year of tax money, which would be balanced against [$20,000] of private money which would push [$40,000] of a sidewalk replacement a year using HUD along with that.

Q. Did your decisions during this period of time with respect to the sidewalk replacement program involve limited resources?

A. Your resources are always limited.

 \* \* \* \* \* \*

Q. Did it require some type of professional judgment on your part of the part of the city council in terms of deciding where to go, where to target?

A. It was based upon a recommendation by myself which was in conjunction with my department heads and with working on how we wanted to proceed and what was the best thing to do and the council generally went along with it.

Q. So that would be a yes to that question?

A. Yes.

Q. Did you also have to consider the feasibility of the sidewalk replacement program and it's effect on some of the other city programs when you made these decisions during that period of time?

A. Yes.

Q. ... [H]ow would you encourage homeowners to join [the fifty-fifty program]?

(Objection overruled).

A. We did a survey program and we did a full block in a targeted area. We had to with the new HUD requirements. We had to send a form out to the people asking ... their income in between certain categories to see if they qualified for low to moderate income and those who did not qualify where the sidewalks needed replacement we gave them options. The option was replace it yourself voluntarily or be ordered by the Board of Works to replace it or join the fifty-fifty program and they always join the fifty-fifty program.

(R. 1103–07). As indicated by Mayor Forsythe's testimony, the City made discretionary decisions about policy formation which involved assessment of competing priorities and a weighing of budgetary considerations and the allocation of scarce resources. *Peavler*, 528 N.E.2d at 45. Therefore we decline to second-guess this decision which clearly involves the exercise of judgment and the formulation of basic policy on the part of Crown Point officials.

### CONCLUSION

Based on the foregoing, we conclude that the trial court erred by failing to find the City of Crown Point immune from liability pursuant to section 34–4–16.5–3(6) of the Indiana Tort Claims Act. The trial court's factual findings were accurate; however, the court applied *Peavler* in a manner which we deem overly narrow. Therefore, the judgment of the trial court is reversed and the jury award vacated.

FRIEDLANDER and ROBERTSON, JJ., concur.