

**FILED**

Jun 10 2015, 8:53 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

J. Thomas Vetne
Brian R. Gates
Jones Obenchain, LLP
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Stephen W. Thompson
Vaughn A. Wamsley
Vaughn A. Wamsley, P.C.
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Indiana Department of
Transportation,

*Appellant-Defendant,*

and

Ricardo Bustos,

*Defendant,*

v.

Paula Sadler, as the Personal
Representative of the Estate of
Roger D. Sadler,

*Appellee-Plaintiff*

June 10, 2015

Court of Appeals Case No.
64A04-1411-CT-544

Interlocutory Appeal from the Porter
Superior Court

The Honorable William E. Alexa,
Judge

Case No. 64D02-1103-CT-2072

**Crone, Judge.**

# Case Summary

Roger D. Sadler was struck by a car and killed as he performed road work on an interstate. Paula Sadler, as personal representative of his estate ("the Estate") filed a wrongful death action against Indiana Department of Transportation ("INDOT"), alleging that Roger's death was caused by INDOT's negligence in failing to temporarily close or block a median crossover as a safety measure during the road work.[1] INDOT filed a summary judgment motion, arguing that it was immune from liability pursuant to the Indiana Tort Claims Act ("ITCA"). The trial court denied its summary judgment motion.

INDOT now brings this interlocutory appeal challenging the denial of its summary judgment motion. INDOT argues that it is entitled to summary judgment because Indiana Code Section 34-13-3-3(7) of the ITCA provides immunity to a government entity or its employee from losses resulting from the performance of a discretionary function and INDOT's decision not to close the median crossover was a discretionary function.[2] We conclude that INDOT has failed to carry its burden to show that it is entitled to immunity. Therefore, we affirm.

---

[1] Ricardo Bustos was also named as a defendant, but he is not participating in this appeal.

[2] INDOT dedicates five pages of its brief arguing that the ITCA immunized INDOT from vicarious liability for an independent contractor's negligence, an issue it acknowledges that the Estate conceded and the trial court did not rule on.

## Facts and Procedural History

[3]   The facts most favorable to the Estate, the nonmoving party, are as follows.[3] INDOT hired Moonrock, Inc., to seal pavement cracks on I-94. The project was a mobile operation, meaning that the workers moved along the road as they worked. An INDOT engineer periodically visited the work site to ensure that Moonrock was following contract specifications, including proper safety precautions.

[4]   Roger was a Moonrock employee. On April 30, 2010, Roger was working in the scope of his employment as part of Moonrock's sealing crew in the left-hand (inside) lane of westbound I-94 just west of mile marker 23.1 in Porter County. In this area, I-94 is a six-lane divided highway with three westbound and three eastbound lanes. Due to the road construction, the left-hand and center lanes of westbound I-94 were closed to traffic, while the right-hand (outside) lane was open. The westbound lanes were closed both east and west of mile marker 23.1, with orange and white construction barrels between the closed lanes and the right-hand westbound lane. On I-94, the westbound and eastbound lanes

---

[3] Appellant's counsel use footnotes rather than citation sentences as required under Indiana Appellate Rule 22. In *City of Elkhart v. SFS, LLC*, 968 N.E.2d 812 (Ind. Ct. App. 2012), we explained,

> Citation sentences are required under our appellate rules. Ind. Appellate Rule 22 (requiring adherence to Bluebook rules); *see* The Bluebook: A Uniform System of Citation R. B2, at 4 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010) ("In non-academic legal documents, citations appear within the text of the document as full sentences or as clauses within sentences directly after the propositions they support.").

*Id*. at 815 n.1. We have admonished counsel for noncompliance with Appellate Rule 22 before. *Lane v. Rosenquist*, No. 43A03-1111-CT-534, slip op. at 3 n.1 (Ind. Ct. App. 2012). A third violation of Appellate Rule 22 may be treated more seriously than merely identifying it in a footnote.

are separated by permanent concrete median barriers. However, at mile marker 23.1 there was an opening in the median barrier, commonly referred to as a median crossover. Median crossovers were created for police, emergency, and maintenance vehicles and are not intended for use by the general public. At mile marker 23.1, there was a "No U-turn" sign posted. Although the inside and center lanes running past the median crossover were blocked to traffic, the crossover itself was not blocked with any temporary traffic control devices.

[5] At approximately 3:00 a.m., Ricardo Bustos was traveling eastbound on I-94 and used the median crossover at mile marker 23.1 to do a U-turn onto westbound I-94. He travelled a short distance in the closed lanes and struck Roger with his vehicle. After several days of intensive medical care, Roger died as a result of the injuries he incurred when Bustos ran into him.

[6] The Estate filed a wrongful death complaint against INDOT and Bustos. Relevant to this appeal, the Estate alleged that INDOT was negligent for failing to temporarily close or block the median crossover at mile marker 23.1 when Moonrock's road crew was in the vicinity, which resulted in Roger's death. INDOT moved for summary judgment arguing that the ITCA shielded it from any claims that it negligently allowed Bustos to enter the I-94 work zone through a median crossover placed in accord with INDOT's departmental policy. The trial court denied INDOT's summary judgment motion. This interlocutory appeal ensued.

# Discussion and Decision

INDOT appeals the trial court's denial of its summary judgment motion.

> When reviewing a grant or denial of a motion for summary judgment our well-settled standard of review is the same as it is for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law. All factual inferences must be construed in favor of the non-moving party, and all doubts as to the existence of a material issue must be resolved against the moving party.

*Kroger Co. v. Plonski*, 930 N.E.2d 1, 4-5 (Ind. 2010) (citations omitted).

"A genuine issue of material fact exists where the facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue." *Vanderhoek v. Willy*, 728 N.E.2d 213, 215 (Ind. Ct. App. 2000). "Where the evidence is in conflict, or undisputed facts lead to conflicting inferences, summary judgment should not be granted, even if it appears that the nonmovant will not succeed at trial." *Dickerson v. Strand*, 904 N.E.2d 711, 715 (Ind. Ct. App. 2009).

INDOT asserts that it is entitled to summary judgment because it has "discretionary function" immunity pursuant to the ITCA. Government entities and their employees are subject to liability for torts committed by them, unless one of the ITCA exceptions provides immunity. *Peavler v. Bd. of Comm'rs of*

*Monroe Cnty.*, 528 N.E.2d 40, 42 (Ind. 1988). Indiana Code Section 34-13-3-3(7) of the ITCA provides that a "governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from ... [t]he performance of a discretionary function."

> The policy underlying governmental immunity is the fundamental idea that certain kinds of executive branch decisions should not be subject to judicial review. The separation of powers doctrine forecloses the courts from reviewing political, social, and economic actions within the province of coordinate branches of government. In this way, the discretionary function exception articulates "a policy of preventing tort actions from becoming a vehicle for judicial interference with decision-making that is properly exercised by other branches of the government." *Blessing v. United States*, 447 F. Supp. 1160, 1170 (E.D. Penn. 1978) (interpreting FTCA discretionary function exception).
>
> ….
>
> Immunity for discretionary functions, however, does not protect all mistakes of judgment. The discretionary function exception insulates only those significant policy and political decisions which cannot be assessed by customary tort standards. In this sense, the word discretionary does not mean mere judgment or discernment. Rather, it refers to the exercise of political power which is held accountable only to the Constitution or the political process.
>
> ….
>
> Immunity assumes negligence but denies liability. Thus, the issues of duty, breach and causation are not before the court in deciding whether the government entity is immune. If the court finds the government is not immune, the case may yet be decided on the basis of failure of any element of negligence. This should not be confused with the threshold determination of immunity.

*Peavler*, 528 N.E.2d at 44-47 (citations omitted).

[10] Whether a government entity is immune from liability is a question of law, which we review de novo. *E. Chicago Police Dep't v. Bynum*, 826 N.E.2d 22, 26 (Ind. Ct. App. 2005), *trans. denied* (2006). Because the ITCA is in derogation of the common law, we construe it narrowly against the grant of immunity. *Lee v. State*, 682 N.E.2d 576, 578 (Ind. Ct. App. 1997), *trans. denied* (1998). The party seeking immunity has the burden of establishing that its conduct falls within one of the exceptions provided by the ITCA. *Id*.

[11] To determine whether a government entity has engaged in a discretionary function and is thereby shielded from tort liability, we use the "planning-operational test." *Peavler*, 528 N.E.2d at 46. Under that test, "a governmental entity will not be held liable for negligence arising from decisions which are made at a planning level, as opposed to an operational level." *Lee*, 682 N.E.2d at 578. A decision is considered a "planning" action where it involves "the formulation of basic policy characterized by official judgment, discretion, weighing of alternatives, and public policy choices." *Voit v. Allen Cnty.*, 634 N.E.2d 767, 770 (Ind. Ct. App. 1994). "Government decisions about policy formation which involve assessment of competing priorities, a weighing of budgetary considerations, or the allocation of scarce resources are also planning activities." *Id*. In contrast, a decision is an "operational" action where it involves only the execution or implementation of already formulated policy. *Id*. "'The governmental entity seeking to establish immunity bears the burden of proving that the challenged act or omission was a policy decision made by

the conscious balancing of risks and benefits.'" *Id*. (quoting *Greathouse v. Armstrong*, 616 N.E.2d 364, 367 (Ind. 1993)).

[12] Here, the basis of the Estate's claim is that INDOT caused Roger's death by negligently failing to temporarily close or block the median crossover while workers were in the vicinity. INDOT contends that it performed a discretionary function when it installed the median crossovers. Specifically, INDOT asserts,

> INDOT formed a committee decades ago to consider whether crossovers are appropriate in light of roadway function, public safety, and the safety of workers who periodically perform roadway maintenance. In particular, the committee had to balance the need to accommodate emergency, maintenance, and traffic-service vehicles against the danger created when authorized or unauthorized vehicles use crossovers.
>
> The result of that committee's deliberations is Departmental Policy 7-6. That policy created specific crossovers along I-94.
>
> ….
>
> INDOT should not face liability for how it weighed competing public policy concerns when it formulated Policy 7-6.

Appellant's Br. at 14-15.

[13] Our review of Policy 7-6 shows that its purpose was to establish median crossovers and guide INDOT in deciding where median crossovers should be placed. For example, Policy 7-6 provides that median crossovers should be kept to a minimum and should not be located in urban areas and specifies the appropriate distance between them. Appellant's App. at 171. Policy 7-6 also lists the location of permitted median crossovers, including the one at mile

marker 23.1. *Id.* at 195. We agree with INDOT's statement that "*[e]stablishing a median crossover at the 23.1 mile-marker on I-94 involved the very type of policy-driven judgment that I.C. § 34-13-3-3(7) protects.*" *Id*. at 14 (emphasis added). *See City of Crown Point v. Rutherford*, 640 N.E.2d 750, 754-55 (Ind. Ct. App. 1994) (concluding that city's decision to repair certain areas of sidewalk and not others was based on formulation of basic policy and balancing of risks and benefits and thus was shielded with discretionary function immunity), *trans. denied* (1995); *Voit*, 634 N.E.2d at 770-71 (concluding that highway department engaged in systematic process for determining what improvements would be made to highways, a policy-making decision that would receive discretionary function immunity).

[14]    However, INDOT's decision to locate a median crossover at mile marker 23.1 is not the action that the Estate alleges caused Roger's death. Rather, the Estate alleges that INDOT's failure to decide to temporarily close or block the median crossover when workers were near it caused Roger's death. Although INDOT asserts that it has a policy to keep median crossovers open at all times that is based on Policy 7-6, Policy 7-6 does not provide any guidance as to whether median crossovers should be kept open at all times. INDOT itself concedes that "Policy 7-6 [does not] explicitly say that crossovers must remain open at all times." Appellant's Br. at 20. Therefore, INDOT's argument that it performed a discretionary function in adopting Policy 7-6 does not adequately address the threshold question of whether INDOT had a policy of never closing median crossovers, which INDOT adopted by weighing alternative solutions and

competing priorities, considering budgetary constraints and the allocation of scarce resources, or performing a risk-benefit analysis.

[15] INDOT claims that the testimony of two of its employees establishes that "it conducted a risk-benefit analysis as to keeping the crossovers open in the vicinity of road-improvement projects." *Id*. at 17. First, INDOT directs us to the affidavit of Mark Miller, INDOT's chief engineer, director of construction management, and chair of its Highway Construction Specification Committee. Miller testified that "Policy 7-6 was guided in its deliberations by three primary concerns: 'roadway function, safety of travelers, and workers who would periodically perform maintenance on the roads.'" *Id*. at 18 (quoting Appellant's App. at 32). However, as we concluded earlier, Policy 7-6 addresses the existence and location of median crossovers but does not show that INDOT adopted a policy that median crossovers remain open when construction workers are present. As such, Miller's testimony fails to answer the threshold question of whether INDOT had a policy that median crossovers remain open during road construction, so we do not find it persuasive. Keeping the crossover open did not preclude blocking a U-turn directly into the closed lanes where the workers were present. The crossover could have stayed open with crossover traffic utilizing the open lanes of westbound I-94.

[16] Second, INDOT refers us to the testimony of Nathan Butts, an INDOT office-area engineer. Butts did not have statewide responsibilities. INDOT asserts, "According to Butts, INDOT 'weighed safety for the public for emergency responses with the safety for the workers on the job-site in deciding whether to

keep those (crossovers) open or closed.'" *Id.* at 19 (quoting Appellant's App. at 226). Our review of Butts's testimony reveals that he answered affirmatively when asked whether he weighed public safety and worker's safety in deciding whether to keep "those medians open *or closed*." Appellant's App. at 226 (emphasis added). He also answered affirmatively when asked whether it was "current policy of INDOT that those median cuts should not be closed by barrels or any type of device." *Id.*

[17] However, Butts also testified that there is nothing in writing from INDOT that requires or specifies that median crossovers always be kept open, but that "it's just general practice." *Id.* More importantly, he testified that INDOT would have been open to either placing a barrel or parking a truck in the median crossover as two viable alternatives that would both protect the public by permitting police and emergency vehicles access through the median crossover while better protecting the workers. Appellee's App. at 138. Viewed in the light most favorable to the Estate, the inference arising from Butts's testimony is that INDOT had not consciously adopted a policy that median crossovers remain open during all road construction; rather, INDOT might have been willing to temporarily close or block a median crossover if circumstances arising from road construction warranted it.

[18] Further, INDOT Standard Specifications, which were incorporated into INDOT's contract with Moonrock, suggest that INDOT did not have a blanket policy of keeping median crossovers open during road construction. Section 105.03 provides, "Any deviation from the plans or specifications that may be

required by the exigencies of construction will be determined by the Engineer and authorized in writing." *Id*. at 9. Section 107.12 provides, "All necessary precautions shall be taken for the protection of the work and safety of the public. … Sufficient barricades, supplemented by watchers or flaggers when necessary, shall be provided continuously to protect any and all parts of the work." *Id*. at 13-14. Such provisions support the position that the engineer assigned to the road construction project had the authority to make decisions regarding safety, including temporarily closing or blocking a median crossover or taking other safety measures that would allow emergency vehicles access through the crossover but blocking access to the closed lanes. Therefore, we conclude that INDOT has failed to carry its burden to show that it had a policy that median crossovers always remain open regardless of the particular safety considerations arising from a given road construction project.

[19] Even if we were to accept INDOT's assertion that Policy 7-6 included a policy that median crossovers always remain open, INDOT concedes that Policy 7-6 permits a deviation from such a policy if authorized in writing by the appropriate INDOT engineer. INDOT asserts that it is nevertheless entitled to immunity because its engineers simply followed the policy of keeping median crossovers open and "nothing about Moonrock's project raised any red flags that would have required INDOT to conclude that an open crossover posed a threat to workers that outweighed the crossover's proven benefits." Appellant's Reply Br. at 8; *see also* Appellant's Br. at 21 ("There was no need for INDOT to reconsider its median crossover policy in the specific context of Moonrock's

work along I-94.").  But INDOT's assertion that it was not necessary under the circumstances to temporarily close the median crossover does not answer the question of immunity.  Rather, the decision whether to close the median crossover under the particular circumstances goes to the heart of the alleged negligence.

[20] Finally, INDOT contends that any decision by one of its engineers as to whether a specific median crossover should be temporarily blocked due to road construction is itself a discretionary function immune from liability because by "its very nature, any decision to open or close a crossover requires a policy-oriented judgment call and a balancing of public interests and safety concerns." Appellant's Reply Br. at 10.  But in determining whether a governmental entity or its employee engaged in a discretionary function, the critical inquiry is "not merely whether judgment was exercised but whether the nature of the judgment called for policy considerations." *Peavler*, 528 N.E.2d at 45.  We agree that the decision whether to temporarily close or block a median crossover due to road construction would require the appropriate INDOT engineer to exercise his or her professional judgment.  But what is the nature of that judgment?

[21] "Exercising professional judgment, without more, is not equivalent to the formulation of basic policy.  Countless government employees make professional judgments every day that do not constitute discretionary functions." *Greathouse*, 616 N.E.2d at 368.  Here, when exercising his or her professional judgment to decide whether to temporarily close a specific median crossover while road workers were near it, the engineer would have to follow

the specific contract provisions governing the road construction project, INDOT's Standard Specifications, and other relevant documents.[4] As such, the engineer's determination of the proper safety precautions for a specific road project at a specific site is more of an implementation of INDOT policies rather than a policy decision in itself; it is performed at an operational level rather than a planning level. Although a government employee may be permitted to exercise some discretion in how he or she implements policy, such discretion does not equate to the level of executive judgments that should be afforded protection under the governmental immunity doctrine. *Id.* at 367. Finally, we observe that the designated evidence shows that no engineer exercised any judgment in deciding whether to temporarily close the median crossover or keep it open while workers were nearby. Butts testified that whether to use barrels or vehicles to temporarily close the median crossover was never considered. Appellee's App. at 138. Given the procedural posture of this case, the designated evidence does not reveal what other safety measures could have been considered and implemented. Leaving a median crossover completely open and unguarded or completely closing it are not the only two options. Some combination of safety devices could be used to allow access through the median crossover to an emergency vehicle while still preventing vehicles from doing a U-turn directly into the closed lanes where workers are present.

---

[4] For example, INDOT Standard Specifications include reference to the Manual of Uniform Traffic Control Devices.

We must construe all factual inferences in favor of the Estate. In addition, we must construe the ITCA against the grant of immunity. We conclude that INDOT has failed to carry its burden to show that it is entitled to discretionary function immunity, and therefore the trial court properly denied its summary judgment motion.

Affirmed.

Brown, J., and Pyle, J., concur.