**CITY OF SOUTH BEND, Appellant,**

v.

**Charles DOLLAHAN, Appellee.**

**No. 46A03–0901–CV–17.**

Court of Appeals of Indiana.

Dec. 15, 2009.

344

Jeffrey L. Sanford, South Bend, IN, Attorney for Appellant.

Thomas K. Downs, Karen L. Arland, Ice Miller LLP, Indianapolis, IN, Attorneys for Amicus Curiae.

Daniel H. Pfeifer, Douglas E. Sakaguchi, Pfeifer Morgan & Stesiak, South Bend, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

The City of South Bend ("City") appeals the trial court's judgment, following a bench trial, holding it liable for injuries suffered by Charles Dollahan ("Dollahan") and ordering it to pay $300,104.00 in damages.

We affirm.

### ISSUE

Whether the trial court's finding that City was liable for Dollahan's loss was clearly erroneous.

### FACTS

In 2000, Dollahan was employed as a brick restorer by Larson–Danielson Construction ("Larson–Danielson"). Larson–Danielson was hired to repair and clean the brick facade of the Wells Fargo bank building, located on Jefferson Boulevard in downtown South Bend. There is a city sidewalk immediately in front of the bank. During the preparation phase, project manager Daniel Speckhard determined that a "boom lift" would be required to raise Dollahan to the necessary height for the job, approximately twenty-five to thirty feet above the ground. A boom lift consists of a hydraulic arm and a cage that is mounted on a four-wheel drive platform base from which an operator can be raised or lifted to a desired height from the ground to perform maintenance or work. The boom lift can be operated from either the base platform or the cage controls.

Anyone seeking to temporarily occupy City's property must obtain a special permit in order to do so. Pursuant to South Bend Municipal Code Article 5, section 6–11(a) the City's engineer is responsible for issuing such permits. Speckhard contacted City's engineering department and informed officials of the masonry project and thought it would require the use of a boom lift that could be placed on the street or sidewalk near the building. The parties agreed that the boom lift could be placed on the sidewalk, as depicted in the sketch contained in the record. (City's Exhibit A, App. 90). Subsequently, City's engineer-

ing department granted Speckhard a temporary occupancy permit authorizing Larson–Danielson to temporarily occupy the sidewalk with its boom lift. At no time did City's engineering officials inform Speckhard of any structural problems with the sidewalk.

Approximately three days before the masonry project was to begin, Dollahan visited the worksite. During the visit, he observed that the sidewalk was not in the best condition and that much of the caulk between the sidewalk joints was cracked and/or missing. He was concerned about placing the boom lift on the sidewalk, given its condition and the weight of the boom lift. He was not in fear for his personal safety, but thought that the boom lift might crack the sidewalk and he could be held personally responsible for the damage. Given the condition of the sidewalk, Dollahan thought the boom lift would likely be placed on the public street.

On August 21, 2000, Dollahan arrived at the worksite to find an eighty-foot boom lift on the sidewalk. He reviewed the permit and learned that City had approved the placement of the boom lift on the sidewalk. He then tested the load-bearing capacity of the sidewalk by operating the boom lift from the base platform controls and increased the pressure on the sidewalk by "hydraulically telescoping the cage platform into the air." (Judgment p. 4). When the sidewalk withstood the stress test, Dollahan decided to proceed. He stood on the platform, entered the cage, and using the cage controls, lifted himself approximately twenty-five or thirty feet into the air. Moments later, the sidewalk cracked suddenly and the boom lift sank into a four-foot fissure beneath the sidewalk. As a result of the sidewalk collapse, Dollahan suffered injuries to his neck and upper back and required extensive medical treatment and multiple surgeries. His medical expenses amounted to $74,634.99, including the cost of disk removal and spinal fusion surgeries. He was unable to return to work and lost wages in the amount of $136,998.05 from August, 2000 to January, 2003.

An ensuing investigation revealed that the subgrade or base material underneath the sidewalk had been washed away by a "recurring leak in an irrigation system in a park area next to the bank[,] and that the washout underneath the sidewalk extended down the block." (Judgment p. 5). The investigation also revealed that some time in the past steel reinforcement I–beams had been inserted into the sidewalk—an unusual reinforcement measure in sidewalk construction indicating prior problems with the sidewalk. (Judgment p. 5; May Depo. p. 32).

In April of 2002, Dollahan filed a complaint for damages in two theories, wherein he alleged that City was liable for (1) negligently issuing the temporary occupancy permit; and/or (2) its failure to warn him, a business invitee, about latent defects in the sidewalk under the theory of premises liability. On April 17, 2002, City filed its answer, but failed to assert the affirmative defense of governmental immunity. At a January 28, 2003 deposition, Dollahan called John May, a City engineer, to testify. Under direct examination, he testified that the I-beam reinforcement method found in the sidewalk was an atypical approach to sidewalk construction. He also testified that the reinforcement indicated that there "was a void before" under the sidewalk because the reinforcement measures would only be necessary if the subgrade was insufficient. (May Depo. p. 32). He further testified that although the reinforced sidewalk could "have held a lot more than pedestrian traffic," the sidewalk would invariably have collapsed were any type of heavy machinery placed upon

it. Lastly, he testified that the void was not readily apparent from a surface observation of the sidewalk, and therefore, could not have been detected before the collapse.

On February 2, 2006, City filed a motion for summary judgment wherein it raised, for the first time, the affirmative defense of governmental immunity. City also designated evidence and a memorandum in support of its motion for summary judgment. On April 3, 2006, Dollahan filed his response and a memorandum in opposition to City's motion. Dollahan also designated May's deposition testimony as proof of a material issue of fact that City was not entitled to summary judgment as a matter of law. Dollahan did not object to City's belated assertion of the defense of governmental immunity. Subsequently, the trial court conducted a hearing on City's motion for summary judgment on May 12, 2006. Dollahan did not argue at the hearing that he had been prejudiced by City's belatedly raised defense. The trial court denied City's motion for summary judgment on May 18, 2006. The parties waived trial by jury, and on October 31, 2008, the trial court conducted a bench trial. City requested findings of fact and conclusions of law pursuant to Trial Rule 52. On December 8, 2008, the trial court heard final arguments. Dollahan argued, for the first time, that City had waived the defense of governmental immunity. At no time, however, did he argue that City's assertion of the defense of governmental immunity was in any way prejudicial to his case.

On December 22, 2008, the trial court issued a judgment in favor of Dollahan. The judgment included, in pertinent part, the following conclusions of law:

30. [City] failed in its Answer to assert any affirmative defenses as to statutory immunity. . . .

31. Defendant City of South Bend owed a duty to Charles Dollahan in ex-ercising its authority to issue a temporary occupancy permit for the placement of the 88,000 pound lift on property owned by the City of [S]outh Bend.

32. Defendant City of South Bend, in the exercise of due care, knew or should have known that given the apparent condition of the sidewalk, the prospect of placement of the 88,000 pound boom lift warranted either further examination of the capacity of the sidewalk to handle the weight-load and stress or, in the alternative, use of the street for placement of the boom lift.

33. The potential inability of the sidewalk to safely handle the weight-load of the 88,000 boom lift, its potential to collapse, and the attendant instability and potential for harm to the boom lift operator were all foreseeable consequences at the time the temporary occupancy permit was issued by the City of South Bend.

34. Defendant City of South Bend breached is [sic] duty of due care to Charles Dollahan and was negligent in its issuance of the temporary occupancy permit for placement of the boom lift on the sidewalk.

35. Given the circumstances presented to him when he arrived at the worksite on August 21, 2000, Charles Dollahan exercised ordinary and reasonable care by exercising prudence and utilizing the available means to test the ability of the sidewalk to handle the increased stress that would be placed on the sidewalk when the caged platform was hydraulically raised up and at an angle to the base of the boom lift.

36. Charles Dollahan was not negligent or at fault in the collapse of the sidewalk and he [sic] injuries he sustained as a result thereof.

37. Defendant City of South Bend's negligence was the proximate cause of

the injuries and damages resulting therefrom to Charles Dollahan as the result of the sidewalk collapse on August 21, 2000.

38. The total sum of those damages sustained by Charles Dollahan as a proximate result of the City of South Bend's negligence is $1,927[,]633.04.

39. Judgment should be entered against defendant City of South Bend for the maximum statutory sum of $3000,000.00,[1] [sic] plus court costs of $104.00[.]

(Judgment pp. 7–8). City now appeals, arguing only that the trial court committed reversible error in its ruling that City had waived the defense of governmental immunity by its failure to timely assert the same.

## DECISION

### I. *Governmental Immunity*

 City challenges, as clear error, the trial court's ruling that City had waived the affirmative defense of governmental immunity by its failure to timely assert the defense. We agree in part, deny in part, and find that error, if any, was harmless.

 In reviewing City's claim of error, we initially note that where the trial court enters findings of fact and conclusions of law, we apply a two-tiered standard of review: we consider whether the evidence supports the findings, and whether the findings support the judgment. *Miller v. Wedekind,* 880 N.E.2d 334, 334 (Ind.Ct.App.2008). The trial court's findings will be set aside only if they are clearly erroneous, i.e. when the record contains no facts or inferences supporting them. *Id.* Further, when review-

ing findings of fact, we neither reweigh the evidence nor assess the credibility of witnesses, but instead consider only the evidence most favorable to the judgment. *Id.*

### A. *Waiver*

City argues that it did not waive the defense of governmental immunity by its failure to assert it earlier and directs our attention to *Borne by Borne v. Northwest Allen County School Corporation,* 532 N.E.2d 1196, 1200 (Ind.Ct.App.1989), *trans. denied.* The Bornes brought an action for damages against the school corporation that operated their daughter's school. The school corporation had failed to assert the affirmative defense of governmental immunity in its answer, but subsequently raised it in a motion for summary judgment. The Bornes moved to strike the defense on the basis of waiver pursuant to Indiana Trial Rule 8(c), which provides that a party seeking to raise an affirmative defense must specifically plead said defense in its responsive pleading. The trial court denied the motion and granted summary judgment in favor of the school corporation.

On appeal, the Bornes argued that the school corporation had waived the defense of governmental immunity. The school corporation countered that the Bornes had been afforded a full and fair opportunity to challenge its assertion of the defense of governmental immunity at trial and, had demonstrated no prejudice from the school corporation's belated raising of the defense. We agreed, citing *Honeywell, Inc. v. Wilson,* 500 N.E.2d 1251 (Ind.Ct.App. 1986), wherein we reversed the trial court's ruling that the defendant had

---

**1.** On December 24, 2008, the trial court entered a *nunc pro tunc* order correcting the sum of the judgment to $300,104.00.

waived an affirmative defense by his failure to raise it earlier in his responsive pleading. We concluded that plaintiff had not demonstrated any prejudice from the defendant's failure to raise the defense earlier, and held,

> 'The[ ] [trial] rules are designed to avoid pleading traps and, to the greatest extent possible, ensure that cases are tried on the issues that their facts present. Thus, the focus is not on technical procedure used to raise the issue, but on the issue's legal merits.'

*Id.* at 1252.

■■■ Guided by *Honeywell,* we identified the critical inquiry in *Borne* as "not whether the defendant could have raised his affirmative defense earlier," but "whether the defendant's failure to raise the affirmative defense earlier prejudiced the plaintiff." *Borne,* 532 N.E.2d at 1199.

> A plaintiff must 'affirmatively show prejudice to his case before [a belatedly raised affirmative defense] can be rejected.' 'The presumption is that issues can be raised as they, in good faith, are developed. This presumption can be rebutted by the party against whom the new issue is raised by an affirmative showing of prejudice. In this context, delay alone does not constitute sufficient prejudice to overcome the presumption. Instead there must be a showing that the party in opposition will be deprived of, or otherwise seriously hindered in the pursuit of some legal right if injection of the new issue is permitted.'

*Id.* (internal citations omitted). We find *Borne* to be directly on point.

Here, the record reveals that Dollahan failed to make an affirmative showing as to how he was prejudiced. During the hearing on City's motion for summary judgment, his counsel limited his remarks to a discussion of City's duty to warn business invitees of hazardous conditions and advanced no argument as to any prejudice Dollahan might have suffered as a result of the belated raising of the defense of governmental immunity. Specifically, counsel remarked,

> I'll pick up where [opposing counsel] left off which was the second argument of government immunity for the issuance or failure to issue a permit. We don't have a response to that, your Honor, so I won't address that. I—I don't see how we get around that portion of their summary judgment motion.

(Tr. 9). Absent such a showing of prejudice, we conclude that City did not waive the defense of governmental immunity.

### B. Discretionary Function

■■ Next, City argues that it is entitled to governmental immunity because its decision to issue the temporary occupancy permit allowing Larson–Danielson to place the boom lift on the city sidewalk was a discretionary function under the Indiana Tort Claims Act (the "Act").

The Act "applies to claims or suits in tort." I.C. § 34–13–3–1; *Hayes v. Trustees of Indiana University,* 902 N.E.2d 303, 313 (Ind.Ct.App.2009). Under the Act, governmental entities are subject to liability for torts committed by their agencies or employees unless one of the immunity provisions of the Act applies. I.C. § 34–13–3–3. For instance, Indiana Code section 34–13–3–3 provides that "[a] governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following: ... (11) the issuance, denial, suspension, or revocation of, or failure or refusal to issue, deny, suspend, or revoke, any permit, license, certificate, approval, order, or similar authorization, where the authority is discretionary under the law...."

■■■ "Ultimately, the determination of whether a governmental action is immune as a discretionary function must be based on the purposes and policy underlying governmental immunity." *Peavler v. Board of Com'rs of Monroe County,* 528 N.E.2d 40, 45 (Ind.1988). The policy underlying governmental immunity is the notion that certain executive branch decisions should not be subject to judicial review. *Id.* at 44. "Policy-making activities lie at the heart of governance and such essential acts should not be subject to judicial second-guessing or harassment by the actual or potential threat of liability litigation." *Id.* "Tort immunity for basic planning and policy-making functions is necessary to avoid the chilling effect on the ability of the government to deal effectively with difficult policy issues which it confronts daily." *Id.* However, in *Cantrell v. Morris,* 849 N.E.2d 488 (Ind. 2006), our supreme court held,

> Immunity for discretionary functions ... does not protect all mistakes of judgment. The discretionary function exception insulates only those significant policy and political decisions which cannot be assessed by customary tort standards. In this sense, the word discretionary does not mean mere judgment or discernment. Rather, it refers to the exercise of political power which is held accountable only to the Constitution or the political process.

849 N.E.2d 488, 495 (Ind.2006) (quoting *Peavler,* 528 N.E.2d at 45).

■■■ In construing Indiana Code section 34–13–3–3(11), we initially note that the governmental entity seeking immunity bears the burden of proving that its conduct falls within one of the exceptions set out in the Act. *Hertz v. School City of East Chicago,* 744 N.E.2d 484, 486 (Ind.Ct.App.2001). We narrowly construe immunity because it provides an exception to the general rule of liability. *Lake County Juvenile Court v. Swanson,* 671 N.E.2d 429, 438 (Ind.Ct.App.1996).

In *Flynn v. Indiana Bureau of Motor Vehicles,* 716 N.E.2d 988, 991 (Ind.Ct.App. 1999), a panel of this court considered the applicability of Indiana Code section 34–13–3–3(11) where Flynn alleged that the Bureau of Motor Vehicles (the "BMV") had negligently issued to her a certificate of title for a vehicle that was later determined to have been stolen. The BMV moved for summary judgment, claiming immunity from liability under the Act, and the trial court granted the motion. On appeal, Flynn argued that the BMV was not immune from liability because its issuance of certificates of title was not a discretionary function. We disagreed, noting the permissive quality of the statutory language governing the BMV's issuance of certificates of title. Specifically, the governing statutory provision stated, "If the [BMV] is satisfied that the person applying for a certificate of title is the owner of the vehicle or is otherwise entitled to have the vehicle registered in the person's name, the bureau *may* issue a certificate of title for the vehicle." I.C. § 9–17–2–10 (emphasis added). We found that "[u]se of the term 'may' ordinarily connotes discretion" and concluded that the BMV's issuance of certificates of title constituted a discretionary decision within the Act, and that the BMV was immune for losses resulting from the issuance of the certificate of title. *Id.*

Here, Article 5, Section 6–11(a) of the South Bend Municipal Code contains comparable permissive language. It provides that "[a]ll temporary occupancy of public property as hereinafter provided for shall be considered and treated as being *at the will of the City,* and will be permitted only by special permit issued by the City Engineer." (App. 60) (emphasis added).

When a statute is clear and unambiguous on its face, we give the words their plain, ordinary, and usual meaning, unless a contrary purpose is clearly shown by the statute itself. *Schafer v. Sellersburg Town Council*, 714 N.E.2d 212, 215 (Ind.Ct.App.1999). Webster's Third New International Dictionary 2617 (1976) defines the phrase "at will" to mean "subject to one's discretion or pleasure." As in *Flynn*, the municipal statutory language above governing City's issuance of temporary occupancy permits clearly indicates a permissive condition and, therefore, warrants finding that decisions regarding issuance of temporary occupancy permits are discretionary within the meaning of the Act. Thus, pursuant to Indiana Code section 34–13–3–3(11), the trial court should have found that City was entitled to governmental immunity if Dollahan's loss resulted from its mere issuance of the temporary occupancy permit—a discretionary act.

We find that the trial court erred when it ruled that City had waived the defense of governmental immunity due to its failure to timely plead it as an affirmative defense in its responsive pleading; however, as discussed below, such error is not dispositive of Dollahan's claim for damages in this case. City's immunity under Indiana Code section 34–13–3–3(11) for Dollahan's damages resulting from its discretionary act of issuing the temporary occupancy permit does not absolve City of liability for its failure to maintain its property in a reasonably safe condition and to warn business invitees of latent defects. Accordingly, we find the error to be harmless.

## II. *Premises Liability*

We initially note that it is undisputed that the sidewalk was City's property, as evidenced by the requirement that a party seeking to temporarily occupy the sidewalk was required by City's Municipal Code to obtain City's permission in order to do so. Nor does City dispute that Dollahan was a business invitee.

Under Indiana's common law, Dollahan was required to establish three elements to recover on a theory of negligence: (1) a duty on the part of City to conform its conduct to a standard of care arising from its relationship with the Dollahan; (2) a failure of City to conform its conduct to the requisite standard of care required by the relationship; and (3) an injury to Dollahan proximately caused by City's breach. *Mayfield v. Levy Co.*, 833 N.E.2d 501, 505 (Ind.Ct.App.2005).

Indiana has adopted the Restatement (Second) of Torts, which provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343. Further, section 343A(1) of the Restatement (Second) of Torts provides, 'a possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.' The Indiana Supreme Court has recognized that, '[i]n premises liabil-

ity cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred.' The rationale is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent any foreseeable harm.

*Smith v. King,* 902 N.E.2d 878, 882 (Ind. Ct.App.2009) (internal citations omitted).

In his complaint, Dollahan alleged that City, as a possessor of land, failed to maintain its property in a reasonably safe condition and to warn of any latent defects in the land upon which the boom lift would be placed. (App. 9). The trial court ultimately agreed, concluding that City,

> in the exercise of due care, knew or should have known that given the apparent condition of the sidewalk, the prospect of placement of the 88,000 pound boom lift warranted either further examination of the capacity of the sidewalk to handle the weight-load and stress or, in the alternative, use of the street for placement of the boom lift.

(Judgment p. 7).

The evidence most favorable to the judgment supports the trial court's conclusion. At trial, May—a City engineer—testified that the presence of the steel I-beam reinforcements indicated that there had previously been a void underneath the sidewalk, because such repairs would only have been necessary if the subgrade material beneath the sidewalk was lacking or deficient. Asked if he had "any reason to believe that there was any noticeable sign of th[e] missing subgrade" before the collapse, May responded, "No. I don't really see how there could be." (May Depo. p. 30).

Thus, we find no clear error from the trial court's conclusions that (1) City knew or should have known that placing heavy mechanical equipment on the sidewalk, given the sidewalk's history of instability,

would create an unreasonable risk of harm to Dollahan; and (2) City, therefore, breached its duty to exercise reasonable care when it failed to maintain the sidewalk in a reasonable safe condition and to warn Dollahan of the latent defect in the sidewalk. We conclude that the trial court's finding and judgment that City was liable based upon the theory of premises liability is well-supported by the evidence; accordingly, we find that the trial court's judgment is not clearly erroneous.

Because Dollahan was a business invitee, City owed him a duty of reasonable care to ensure his safety while he was on City's property. The foregoing evidence reveals that City had actual knowledge of the latent subgrade problem beneath the sidewalk, breached its duty of reasonable care by failing to warn Dollahan of said defect, particularly given Larson–Danielson's stated intention to place heavy machinery on the sidewalk, and that Dollahan's injuries were proximately caused by City's breach of duty. We find that Dollahan has satisfied his burden of proof and we find no error from the trial court's judgment of City's liability.

### C. *Policy*

The Indiana Association of Cities and Towns ("IACT") and the Indiana Municipal Lawyers Association ("IMLA"), as *amici curiae,* assert that the trial court's decision withholding City's defense of governmental immunity, if affirmed, may have adverse financial consequences "for cities and towns throughout the state, effectively requiring a local government to undertake engineering studies for every private construction project ... prior to issuing any construction or building permit ..."; and potentially "result[ing] in increased costs on the private sector by increasing the cost of obtaining the construction and building permits necessary

to undertake construction...." Amici's Br. at 4.

Amici's argument is better directed to the Legislature. Inasmuch as Amici appear to be arguing that City is absolutely immune from liability, we note that by its holding in *Campbell v. State*, 259 Ind. 55, 284 N.E.2d 733 (1972), our supreme court abolished the doctrine of sovereign immunity in Indiana for most purposes. In 1974, the General Assembly responded by enacting the Act, which "partially reinstated" the sovereign immunity by immunizing governmental entities and their officers acting within the scope of their employment from liability under certain limited circumstances. *Brown v. Alexander*, 876 N.E.2d 376, 380 (Ind.Ct.App.2007). We posit that had the Legislature intended that governmental entities be made absolutely immune from all tort liability, it simply would have reinstated the sovereign immunity scheme in its entirety.

Moreover, under the unique facts and circumstances herein, where City had actual knowledge of the latent defect and had previously attempted to rectify the subgrade deficiency beneath the sidewalk, there was no need for City to incur extensive financial outlays or to commission costly engineering studies to detect the problem. Rather, City needed only to consult its maintenance department and/or repair records and to communicate its findings to business invitees in order to reasonably ensure their safety from latent defects on City's property.

Affirmed.

MATHIAS, J., concurs.

ROBB, J., dissenting with separate opinion.

ROBB, Judge, dissenting.

The majority concludes the evidence supports the trial court's conclusion that the City "knew or should have known that placing heavy mechanical equipment on the sidewalk, given the sidewalk's history of instability, would create an unreasonable risk of harm to Dollahan." Op. at 353. I respectfully dissent.

John May, City engineer, testified in his deposition that steel beams had been placed directly under the sidewalk every six feet and the space between the beams had been backfilled and compacted before the sidewalk was poured. The purpose of the beams was reinforcement; use of the beams is not common and would not have been necessary if the subgrade was sufficient. Once the sidewalk collapsed, it was clear the sand between the beams had washed away and although the concrete sitting atop the beams could still "support a substantial amount of weight," it could not support "something unforeseen ... that was really heavy." Appellant's App. at 30. However, May had no reason to believe there was any noticeable sign of missing subgrade under the sidewalk prior to its collapse.

Given this evidence, I come to a conclusion opposite that of the trial court and the majority. The City knew there had previously been a void under the sidewalk and took steps to reinforce the sidewalk. There is no evidence suggesting the steel beams and backfill were an insufficient means of reinforcement. There is no evidence suggesting the City knew when it issued this permit the sidewalk was no longer adequately reinforced. In short, I believe the evidence shows the City corrected the defect in the sidewalk by placement of the steel beams and did not know and had no reason to know the defect had recurred. *See Louisville Cement Co. v. Mumaw*, 448 N.E.2d 1219, 1221 (Ind.Ct. App.1983) ("The owner ... of premises who discovers the existence of a latent or concealed defect in the property which is

not likely to be discovered by an invitee may at his option, either correct the condition, or warn the invitee of the latent defect's existence. The owner discharges his duty to the invitee if he follows either course."), *disapproved on other grounds, Bagley v. Insight Commc'ns Co., L.P.,* 658 N.E.2d 584, 588 (Ind.1995). I would hold the trial court's judgment is not supported by the evidence and reverse.