FILED
Mar 10 2025, 8:48 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court





IN THE

# Court of Appeals of Indiana

Howard Larky,

*Appellant-Plaintiff*

v.

Camp Livingston, Inc.,

*Appellee-Plaintiff*

---

March 10, 2025

Court of Appeals Case No.
24A-CT-1529

Appeal from the Switzerland Circuit Court

The Honorable W. Gregory Coy, Judge

Trial Court Cause No.
78C01-1806-CT-156

---

**Opinion by Chief Judge Altice**
Judges Foley and Kenworthy concur.

**Altice, Chief Judge.**

## Case Summary

[1] Eleven-year-old Jadyn Larky (Jadyn) was tragically killed by a falling tree while attending summer camp at Camp Livingston, Inc. (the Camp), in Switzerland County, Indiana. Her father, Howard Larky (Father), filed a child wrongful death action against the Camp in June 2018. In his complaint, Father named as a codefendant Liza Larky (Mother), his ex-wife with whom he had shared custody of Jadyn. The next month, Mother was dismissed from the action after voluntarily abandoning any claims that she may have had against the Camp relating to Jadyn's death.

[2] More than five years after filing its answer, and only a few weeks before trial, the Camp filed a motion for leave to amend its answer to include the new affirmative defense of release. That is, the online camp registration that Mother had executed prior to Jadyn's attendance purportedly contained a written release that barred Father's claim. Over Father's objection, the trial court permitted the Camp to amend its answer. The trial was then continued so that this new affirmative defense could be considered on summary judgment.

[3] The trial court ultimately granted summary judgment in favor of the Camp. The court concluded that the release signed only by Mother was binding on both parents under the Child Wrongful Death Statute (CWDS) and that the release precluded Father's claim for damages based on the Camp's negligence.

[4] On appeal, Father contends that the trial court abused its discretion by allowing the Camp to amend its answer to assert the affirmative defense of release. He also argues that the trial court improperly granted summary judgment to the Camp on the basis of the release.

[5] We reverse and remand.

## Facts & Procedural History[1]

[6] Mother and Father, both residents of Ohio, divorced in 2012 and agreed to a shared parenting plan for their children, Jadyn and her younger sister. The agreement provided for joint legal custody and shared physical custody, though the children were to spend the bulk of their time with Mother.[2] Pursuant to Ohio Revised Code § 3109.04, the agreement provided that "both Mother and Father shall each be designated residential parents and legal custodians … regardless of where the children are physically located or with whom the children are residing at the time. Mother shall be designated the residential parent … for school purposes only." *Appendix* at 109.

---

[1] Oral argument was held on February 20, 2025, at the Red Skelton Performing Arts Center on the Campus of Vincennes University. We thank the university's leadership, faculty, and students, particularly the members of the Legal Studies Club, for their warm welcome on such a blustery morning. We also appreciate counsel traveling to this argument so that the students and public could witness their skillful advocacy.

[2] The Camp incorrectly asserts that Mother and Father equally shared physical custody of the children. The designated evidence establishes that Father was granted parenting time of "at least two (2) weekday evenings" and "every other weekend" and that this schedule was to continue during the summer, except that each parent was entitled to two uninterrupted week-long summer vacations. *Appendix* at 109-110.

[7]     In October 2015, Mother completed an online camp registration (the Application) for Jadyn to attend the Camp from June 12 to July 7, 2016. The last portion of the Application included a list of twenty-five terms and conditions to which Mother agreed with her electronic signature. The list included at bullet point fourteen:

> I have read and approve of this application in its entirety. I hereby release Camp Livingston, Inc. and The Jewish Federation of Cincinnati, their respective officers, directors, employees, volunteers, agents, and other representatives from any and all responsibility of any nature for such actions and for any loss or damage to property or personal injury to my child while attending Camp Livingston, regardless of how such injury or harms arise, and regardless of who is at fault.

*Id*. at 81.[3]

---

[3] The following reflects the actual release provision (third bullet point) in the context of its surrounding terms:

- Acknowledgement of Risk and Statement of Responsibility. I acknowledge that there are risks inherent in traveling away from camp property and I agree to assume and accept all risks and responsibility for my child(rens) health, safety, and property. Without reservation, and on behalf of myself, my heirs, and my estate, I release Camp Livingston, Inc., its officers, trustees, agents, and employees, including, but not limited to, any staff member accompanying or directing this program, from any claim or liability of whatever nature arising out of, or in any way related to my participation in any trip, including, but not limited to, injury, loss, damage, accident, medical or other expense from any cause whatsoever (including but not limited to, sickness, accident, weather, act or omission of a common carrier, landlord, hotel, restaurant, private or government internship provider, or other agency or entity) unless the Camp is grossly negligent.
- Should my child(ren) require any medical treatment I grant the Camp, or those with whom the Camp may be in contact, full authority to consent to whatever action they feel is warranted under the circumstances regarding my child(ren's) health and safety, including medical treatment or evacuation, all at my expense.
- I have read and approve of this application in its entirety. I hereby release Camp Livingston, Inc. and The Jewish Federation of Cincinnati, their respective officers, directors, employees, volunteers, agents, and other representatives from any and all responsibility of any nature for such actions and for any loss or damage to property or personal injury to my child while attending Camp Livingston, regardless of how such injury or harms arise, and regardless of who is at fault.
- It is agreed that any dispute or cause of action arising between the parties, whether out of this agreement or otherwise, can only be brought in the Hamilton County Court of Common Pleas located in the County of Hamilton, Ohio, and shall be construed in accordance with the laws of Ohio.
- I understand that part of the camping experience involves activities and group interactions that may be new to my child, and that they come with uncertainties beyond what my child may be used to dealing with at home. I am also aware that my child may participate in off-campus activities such as recreational field trips to local amusements or camping trips that involve additional risks. I am aware of these risks and I am assuming them on behalf of my child. I realize that no environment is risk-free and so I have instructed my child on the importance of abiding by Camp's rules. My child and I both agree that he or she is familiar with these rules and will obey them.

[8] Father did not sign the Application, but when generally asked about the Application during a deposition,[4] he acknowledged that he was "involved in" the Application to the extent that he paid part of the registration fee. *Id*. at 100.

[9] In the early morning hours of June 21, 2016, a thunderstorm with extremely high wind gusts passed through the campground. During the storm, a large tree broke at its base and crashed through the roof of the cabin in which Jadyn was sleeping. Jadyn was crushed by the trunk of the tree and died in her bed.

[10] On June 15, 2018, Father filed the instant action against the Camp seeking damages for Jadyn's wrongful death. He claimed that the Camp breached its duty to "exercise reasonable care to protect [Jadyn] from the fatal injury while she was on [the Camp's] property." *Id*. at 142. Pursuant to I.C. § 34-23-2-1(c)(1) of the CWDS, Father named Mother as a codefendant to answer as to her interests. She was then quickly dismissed with prejudice after voluntarily abandoning any claims against the Camp relating to Jadyn's death.

[11] The Camp, represented by Vincent P. Antaki (Attorney Antaki), filed its answer on July 5, 2018. The Camp asserted several affirmative defenses and reserved the right to add more "as may be found to be applicable during the course of discovery." *Appendix* at 32.

---

[4] The Application was not used as an exhibit during Father's deposition.

[12] Thereafter, litigation appears to have stalled for about a year until Father retained new counsel in July 2019.[5] Thereafter, several depositions were conducted starting in early 2020, and at a pretrial conference in May 2020, a jury trial was scheduled for July 27, 2021. The jury trial was later rescheduled, apparently by agreement, to August 31, 2021, and then to September 20, 2022. All the while, the parties were exchanging witness and exhibit lists, deposing witnesses, disclosing expert witnesses, and filing motions.

[13] Less than a week before the scheduled September 2022 trial, the court rescheduled the jury trial to April 18, 2023, on its own motion due to "unforeseen circumstances." *Id.* at 9. Trial was then reset several more times in 2023, the last of which occurred in October, on the court's own motion the day before the trial was set to start.[6] This resulted in the trial being reset for January 8, 2024.

[14] Meanwhile, new counsel for the Camp, Kevin Schiferl (Attorney Schiferl), filed an appearance on September 14, 2023. Thereafter, on December 15, 2023, Attorney Schiferl's partner Maggie Smith also filed an appearance on behalf of the Camp. On December 18, exactly three weeks before trial, Attorney Antaki

---

[5] The Camp incorrectly asserts that "the case sat dormant for years until minimal discovery was conducted." *Appellee's Brief* at 18. There was only a year of inactivity at the beginning.

[6] A hearing was held the day before trial to address recent objections raised by the Camp to video deposition designations filed by Father and Father's motion for jury view. At that hearing, the court determined that a continuance was required so that the court could familiarize itself with the issues and hold an additional hearing. The trial court later granted Father's motion for jury view of the accident site, and the Camp then filed a motion for reconsideration or, in the alternative, a motion to certify the order for interlocutory appeal. Both were denied by the trial court on November 15, 2023.

withdrew his appearance, and the Camp, by Attorney Schiferl, filed a motion for leave to amend its answer pursuant to Ind. Trial Rule 15(A). Specifically, the Camp sought to add the affirmative defense of release. In its motion, the Camp asserted that the Application containing the release had been provided to Father in discovery years earlier and thus the amendment would not prejudice him. The Camp included no explanation in the motion for its delay in asserting the defense. The trial court granted the motion the next day without Father having an opportunity to respond.

[15] On December 20, 2023, Father filed a motion to reconsider and vacate the order granting the Camp's motion to amend. Father argued that the Camp's delay in adding the affirmative defense was inexcusably dilatory given the fact that the Camp had the alleged release in its possession throughout the entire case and never mentioned the release language contained in the Application (not in depositions, pretrial conferences, or exhibit lists). Further, Father argued that the time for dispositive motions had long since passed and that the effect of a release is a question of law, not a question for the jury. In sum, Father argued that the Camp had sat on the issue for over sixty-five months and then raised it on the eve of trial. The next day, December 21, the trial court summarily denied Father's motion to reconsider.[7]

---

[7] The Camp filed a response to Father's motion to reconsider several days after the trial court ruled on the motion.

On December 26, 2023, in light of the Camp's new defense, Father filed an unopposed motion to continue the jury trial set for January 8, 2024, which the court granted. The trial court then held a scheduling conference and set new summary judgment deadlines. Pursuant to this schedule, the Camp filed a motion for summary judgment based on the release language contained in the Application that was signed by Mother. Father opposed the motion on two grounds: (1) the release language was not sufficiently specific and explicit to release the Camp from liability for its own negligence; and (2) the Application was signed only by Mother and therefore any release contained therein did not apply to bar Father's wrongful death claim. After a hearing, the trial court granted summary judgment in favor of the Camp. Father now appeals.

## Discussion & Decision

### 1. The trial court abused its discretion by granting the Camp's motion to amend its answer to assert the affirmative defense of release more than five years into the litigation.

As relevant here, Ind. Trial Rule 15(A) provides that "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be given when justice so requires."[8] "Consistent with an underlying purpose to facilitate decisions on the merits and to avoid pleading traps, the Indiana Trial Rules generally implement a policy of liberal amendment of pleadings, absent prejudice to an opponent." *Kimberlin v. DeLong*, 637 N.E.2d

---

[8] T.R. 15(A) provides for amendment of pleadings as of right under circumstances not applicable here.

121, 128 (Ind. 1994). A trial court retains broad discretion to grant or deny motions to amend pleadings. *Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 842 (Ind. Ct. App. 2016), *trans. denied*.

[18] Accordingly, we will reverse only where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or when the trial court has misinterpreted the law. *Id*.

> We judge an abuse of discretion by evaluating several factors, including "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiency by amendment previously allowed, undue prejudice to the opposing party by virtue of the amendment, and futility of the amendment."

*Id.* (quoting *Hilliard v. Jacobs*, 927 N.E.2d 393, 398 (Ind. Ct. App. 2010), *trans. denied*).

[19] Father notes that release is a defense that a defendant must "set forth affirmatively" in its answer. Ind. Trial Rule 8(c). Further, despite having the Application with the release in its possession the entire time, he observed that the Camp waited over five years – until just three weeks before trial – to put him on notice that it intended to assert a defense of release. Father argues that the lengthy delay was undue because the Camp offered no justification for the delay in its motion to amend. For example, the Camp did not claim that the new affirmative defense was developed from newly discovered evidence – nor could it, as the Application was always in the possession of the Camp.

[20] In the summary judgment order, the trial court expressly noted that Attorney Antaki "never mentioned the release … at any time while the case was pending" and that the court "lack[ed] understanding as to why an issue with the potential to completely dispose of the case was not litigated sooner[.]" *Appendix* at 21 n.2.

[21] The only justification provided by the Camp is that the legal significance of the release was not realized until Attorney Schiferl was retained by the Camp and began reviewing the case files for trial. The Camp, however, does not explain why Attorney Antaki never raised the defense in the more than five years that he was representing the Camp.[9]

[22] In *Hilliard*, this court affirmed the denial of a plaintiff's motion for leave to amend her complaint to bring a new claim, finding two factors to be dispositive: undue delay and prejudice. 927 N.E.2d at 398. Regarding delay, we observed that the plaintiff sought to bring the new claims more than three years after the original complaint even though the claims were available all along. *Id.* at 399 ("We conclude that Hilliard's actions in waiting over three years to assert claims that could have been raised in the original complaint and raising them only after this Court had ruled on the trial court's summary judgment order constitutes undue delay."); *see also Hendrickson v. Alcoa Fuels, Inc.*, 735 N.E.2d

---

[9] Father suggests that Attorney Antaki might have strategically chosen not to assert the affirmative defense after evaluating its likelihood of success and/or considering that raising the defense might have drawn attention to the choice of law provision in the Application, requiring suit to be brought in Ohio and be governed by Ohio law.

804, 818 (Ind. Ct. App. 2000) (affirming denial based on undue delay where plaintiffs "moved to amend their complaint for a third time almost four years after filing their original complaint and three months after [defendants] filed summary judgment motions"); *Gen. Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 142 (Ind. Ct. App. 1997) (affirming denial where amendment was sought four years after the original complaint and two years after the first amended complaint and plaintiff did not assert the discovery of new evidence that might have justified the delay[10]), *trans. denied*.

[23] Regarding prejudice, the *Hilliard* court observed that the facts of each case must be examined to determine if the threat of prejudice is sufficient to justify denying leave to amend. "This entails an inquiry into the hardship to the moving party if leave to amend is denied, the reasons for the moving party failing to include the material to be added in the original pleading, and the injustice resulting to the party opposing the motion should it be granted." 927 N.E.2d at 400. In finding undue prejudice, the *Hilliard* court again discussed the plaintiff's lengthy delay in seeking to assert claims "that could have been raised in the original complaint," and observed that the plaintiff "offered no convincing reason for foregoing the opportunity to fully present these claims in a more timely fashion." *Id*.

---

[10] The court recognized that a party is not always required to allege that it has new evidence justifying the amendment but noted that such evidence may be considered in determining whether the delay was undue. *Gen. Motors*, 685 N.E.2d at 142 n.9.

The Camp argues that delay in asserting an affirmative defense cannot by itself establish prejudice and that Father was required to affirmatively show that he was prejudiced by the delay. *See City of S. Bend v. Dollahan*, 918 N.E.2d 343, 350 (Ind. Ct. App. 2009) (observing that "the critical inquiry" is not whether the defense could have been raised earlier but whether defendant's delay in doing so prejudiced the plaintiff), *trans. denied*.

> A plaintiff must affirmatively show prejudice to his case before a belatedly raised affirmative defense can be rejected. The presumption is that issues can be raised as they, in good faith, are developed. This presumption can be rebutted by the party against whom the new issue is raised by an affirmative showing of prejudice. In this context, delay alone does not constitute sufficient prejudice to overcome the presumption. Instead there must be a showing that the party in opposition will be deprived of, or otherwise seriously hindered in the pursuit of some legal right if injection of the new issue is permitted.

*Id*. (cleaned up).

We find *Dollahan* to be distinguishable. There, the City raised the affirmative defense of governmental immunity on summary judgment, and Dollahan, the plaintiff, did not object to the belated assertion of the defense and "advanced no argument as to any prejudice Dollahan might have suffered as a result." *Id*. Ultimately, the trial court denied the City's motion for summary judgment and a bench trial commenced two years later. It was not until final argument that Dollahan argued that the City had waived the defense, but he still made no argument regarding prejudice. On appeal, we held that the trial court erred in

finding the defense waived. In so holding, we noted our disdain for pleading traps and focused on Dollahan's wholesale failure to make any showing of prejudice. *Id*. ("Absent such a showing of prejudice, we conclude that City did not waive the defense of governmental immunity.").

[26] In contrast, Father objected to the amendment at his earliest opportunity, and he argued to the trial court that he would be prejudiced by the eleventh-hour amendment. Further, there was no pleading trap here, as this is not a circumstance where the parties had been litigating the defense (like in *Dollahan*) despite it not yet being pled. On the contrary, the case had been moving along for five years and was three weeks away from trial with no mention, up until then, of the release language, not even a specific designation of the Application as a trial exhibit.

[27] There had been many trial settings in this case with one in September 2022 that was rescheduled less than a week before trial and another in October 2023 that was rescheduled the day before trial on the trial court's own motion because it needed time to consider Attorney Schiferl's objections, raised on behalf of the Camp, to portions of depositions designated for trial by Father and to Father's motion for jury view. These trial issues were litigated by the parties, and on November 9, 2023, the Camp asked the trial court to certify for interlocutory appeal the order granting Father's request for jury view. More than a month after the trial court's denial of the motion to certify, and only three weeks before trial, the Camp raised the affirmative defense of release for the very first time, turning the case on its head on the eve of trial with no explanation for the delay.

[28]     The Camp argues that it "provided the most transparency and notice to [Father] and the [trial court] in advance of trial" and demonstrated good faith by utilizing T.R. 15(A) when it did. *Appellee's Brief* at 41. The Camp claims that it "could have said nothing and simply presented the issue at trial" pursuant to T.R. 15(B). *Appellee's Brief* at 40. T.R. 15(B) provides: "When issues not raised by the pleadings are **tried by express or implied consent of the parties**, they shall be treated in all respects as if they had been raised in the pleadings." (emphasis supplied). We find the Camp's suggestion in this regard rather fanciful, as Father was highly unlikely to have consented to the never-before-mentioned affirmative defense of release being litigated at trial.[11]

[29]     Under the circumstances of this case, we believe that allowing the late amendment – effectively blindsiding Father and the trial court more than five years into the case with no good reason for the delay – was fundamentally unfair and prejudicial to Father. It cannot be doubted that Father would have prepared his case differently had the Camp put him on notice of the defense, and this potentially dispositive legal issue could have been addressed years

---

[11] "Implied consent to trial of an unpleaded defense may not be deduced merely because evidence relevant to a properly pleaded defense inferentially suggests a defense not within the pleadings." *Elkhart Cnty. Farm Bureau Co-op. Ass'n, Inc. v. Hochstetler*, 418 N.E.2d 280, 284 (Ind. Ct. App. 1981). Rather,

> implied consent will be found only where the opposing party knew or should have known that an unpleaded issue was being presented at trial. [T.R.] 15(B) does not require the opposing party to scrutinize every shred of evidence relevant to a pleaded issue to find allusions to unpleaded issues…. Trial Rule 15(B) was intended to permit amendment to the pleadings only when evidence on an unpleaded issue is "unequivocally clear" to the opposing party but is nevertheless admitted without objection.

*Id*. at 285.

earlier, avoiding needless litigation and judicial inefficiency. We recognize the broad discretion afforded trial courts in these matters, but that discretion is not limitless and affirming in this case would be the proverbial rubber stamp that we will not use. Accordingly, we hold that the trial court abused its discretion by granting the Camp's motion to amend.

## 2. Even if the late amendment was proper, the trial court erred in granting summary judgment in favor of the Camp.

[30] Only the Camp designated evidence on summary judgment; Father challenged the Camp's motion for summary judgment on purely legal grounds, which was his right.[12] Because the interpretation of a written contract, including a release, is a question of law, we will conduct a de novo review of the trial court's decision to grant the Camp's motion for summary judgment. *City of Hammond v. Plys*, 893 N.E.2d 1, 3 (Ind. Ct. App. 2008) (citing *Avant v. Community Hosp.*, 826 N.E.2d 7, 10 (Ind. Ct. App. 2005), *trans. denied*).

[31] When reviewing a contract, we examine the language used to express the parties' rights and duties to determine their intent. *Id.* Words are given their usual meaning unless it is clear from the context that another meaning was intended. *Id.* "Words, phrases, sentences, paragraphs, and sections of a contract

---

[12] The Camp seems to suggest that Father was required to designate evidence in opposition to its motion for summary judgment. But this is incorrect, as summary judgment here, unlike the cases cited by the Camp, turns on the interpretation of a contract, which is a question of law, not fact. *See Powell v. Amer. Health Fitness Ctr. of Fort Wayne, Inc.*, 694 N.E.2d 757, 760 (Ind. Ct. App. 1998) (rejecting similar argument and noting that plaintiff could defend against summary judgment on the material designated by defendant, particularly where the validity of the exculpatory clause – a question of law – was the dispositive issue).

cannot be read out of context. If possible, the entire contract must be read together and given meaning." *Id*. (quoting *Avant*, 826 N.E.2d at 10).

[32] "In the absence of legislation to the contrary, it is not against public policy in Indiana to enter into a contract that exculpates one from the consequences of his own negligence." *Avant*, 826 N.E.2d at 10. To ensure a party's knowing and willing acceptance of this harsh burden, however, an exculpatory clause must "specifically and explicitly refer to the negligence of the party seeking release from liability." *Plys*, 893 N.E.2d at 3 (quoting *Powell*, 694 N.E.2d at 760); *see also Avant*, 826 N.E.2d at 10. Further, while the clause need not use the word "negligence," it must convey the concept specifically and explicitly through other language. *Plys*, 893 N.E.2d at 3; *Avant*, 826 N.E.2d at 12.

[33] In *Avant*, this court concluded that the following language was specific and explicit as to plaintiff Avant's agreement to release the defendant health club for its own negligence, including the negligent acts of its employees:

> I promise and agree … not to sue and agree to release … Fitness Pointe, its agents, employees, members and all other personal [sic] or entities acting on its behalf **from all claims, demands, rights and causes of action of any kind, whether arising from my own acts or those of Fitness Pointe.** I hereby waive all claims for personal injury or property damage arising from my activities or use of the facilities and equipment at Fitness Pointe, and I accept, assume and incur all responsibility for the risk of injury from such activity and exercise.

826 N.E.2d at 9 (emphasis supplied). The court observed that the release included terms generally associated with negligence: "claims," "causes of

action," "acts," "damage," "responsibility," and "injury." *Id*. at 11. In the context of the entire exculpatory clause, the court held that "these words clearly demonstrate that the Release encompasses negligence." *Id*.

[34] In *Plys*, this court found the following language contained in a release (signed by plaintiff for her participation at fitness center) to be specific and explicit enough to release the defendants from liability for their own negligence:

> I specifically agree to indemnify and **hold harmless** Hammond Parks and Recreation Department, the Hammond Civic Center, or the City of Hammond, Indiana **as to any loss, cost, claim, injury, damage or liability**, sustained or incurred by using the facilities or equipment of the Hammond Parks and Recreation Department, the Hammond Civic Center, or the City of Hammond, Indiana which is **caused by an act or omission, whether negligent, intentional or otherwise, of an employee, representative, or agent of the Hammond Parks and Recreation Department, the Hammond Civic Center, or the City of Hammond, Indiana.**

893 N.E.2d at 2 (emphases supplied).

[35] The exculpatory provision at issue in this case provides:

> I have read and approve of this application in its entirety. I hereby release Camp Livingston, Inc. and The Jewish Federation of Cincinnati, their respective officers, directors, employees, volunteers, agents, and other representatives from any and all responsibility of any nature for such actions and for any loss or damage to property or personal injury to my child while attending Camp Livingston, regardless of how such injury or harms arise, and regardless of who is at fault.

*Appendix* at 81. Father argues that unlike the cases discussed above, this provision does not specifically refer to the acts of the Camp or its employees. And he notes that it does not use the term "negligence" or "negligent," much less refer to the negligence of the Camp. He likens this case to *Powell v. Am. Health Fitness Ctr. of Fort Wayne, Inc.*, 694 N.E.2d 757 (Ind. Ct. App. 1998).

[36] The *Powell* court found the following language (contained in membership agreement) to be insufficient to release the defendant health club from liability for its own negligence:

> By signing this agreement and using the Club's premises, facilities and equipment, Member expressly agrees that the Club will not be liable for any damages arising from personal injuries sustained by Member … in, on, or about the Club, or as a result of using the Club's facilities and equipment. Member assumes full responsibility for any injuries, damages or losses which may occur to Member … in, on, or about the Club premises or as a result of using the Club's facilities and equipment. Member agrees that the Club shall not be liable for any loss or theft of personal property in or about the Club premises and does hereby fully and forever release and discharge the Club and all associated clubs, their owners, employees and agents from any and all claims, demands, damages, rights of action, or causes of action … resulting from or arising out of Member's … use or intended use of said Club premises, facilities or equipment.

*Id*. at 759. The court held that "an exculpatory clause must both specifically and explicitly refer to the negligence of the party seeking release from liability" and that this clause did neither. *Id*. at 761 ("Nowhere does the clause specifically or explicitly refer to the negligence of American Health.").

[37] While the provision in *Powell* included language that could be associated with negligence, Father observes that this court held that the provision did not specifically or explicitly refer to the acts of the health club or its employees. And Father notes that subsequent cases have distinguished *Powell* on this basis. *See Plys*, 893 N.E.2d at 5 (observing that the release in *Powell* "did not even mention the acts of the club or its employees"); *Avant*, 826 N.E.2d at 12 ("In contrast [to the clause in *Powell*], the plain language of this Release was specific and explicit as to Avant's agreement to indemnify Fitness Pointe for its negligence, including negligent acts of its employees.").

[38] The Camp argues that although the release does not include the word "negligence," it sufficiently conveys the concept specifically and explicitly through other language like in *Avant* and *Plys*.[13] But the Camp does not respond to Father's clearly articulated argument that regardless of whether the release sufficiently conveyed the concept of negligence, the release still failed to "specifically refer to the acts **of the Camp**." *Appellant's Brief* at 14 (emphasis supplied); *see also Appellant's Reply Brief* at 17 ("[Father] does not contend that the release had to include the term 'negligent or negligence.' Rather, … the problem with the alleged release here is that it does not clearly and unequivocally show an agreement to release the Camp for any of its own negligent actions.").

---

[13] The Camp highlights the following terms associated with negligence found in the release: responsibility, loss or damage, personal injury, injury, harms, and fault.

[39] Recently, in *Brooks v. USA Track & Field, Inc.*, 247 N.E.3d 1 (2024), *trans. pending*, another panel of this court considered, among other issues, the enforceability of a particular waiver and indemnity agreement and reaffirmed that such provisions must specifically and explicitly refer to the negligence of the party seeking release from liability. In finding the provision enforceable, the court engaged in two necessary inquiries: (1) whether the provision expressly "define[d] negligence as an area of application in clear and unequivocal terms" and (2) whether the provision "clearly and unequivocally provide[d] that Brooks agreed to waive and indemnify USATF for USATF's own negligence." *Id.* at 15-16.

[40] We agree with Father that the release failed on the second step of the analysis. At oral argument, the Camp highlighted the broad, all-encompassing language of the release[14] and seemingly argued that such language necessarily includes release for the Camp's own acts. But more is required when a party to a release seeks to exculpate itself from the consequences of its own negligence. The Camp could have very easily drafted the provision in question to specifically and explicitly release the Camp from liability for its own acts. Having failed to do so, the Camp is not shielded from liability resulting from the fatal injuries sustained by Jadyn that were caused by the Camp's alleged negligence.

---

[14] The operative language released the Camp "from any and all responsibility of any nature for such actions and for any loss or damage to property or personal injury to my child while attending Camp Livingston, **regardless of how such injury or harms arise, and regardless of who is at fault**." *Appendix* at 81 (emphasis supplied).

Accordingly, the trial court erred by granting summary judgment for the Camp.[15]

[41]    Judgment reversed and cause remanded for further proceedings.

Foley, J. and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT

Carol Nemeth Joven
Indianapolis, Indiana

Kenneth G. Doane, Jr.
Clarksville, Indiana

Jeffrey A. Flores
Madison, Indiana

ATTORNEYS FOR APPELLEE

Kevin C. Schiferl
Maggie L. Smith
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA HOSPITAL ASSOCIATION

Michael W. Phelps
Indianapolis, Indiana

---

[15] Because we have found the release language insufficient to release the Camp from liability for its own negligence, we do not reach the question of whether the release, signed only by Mother, was binding on Father and applied to bar his wrongful death claim.